[No. A134219. First Dist., Div. Two. Nov. 29, 2012.]

Adoption of A.S., a Minor.
KATHRYN S., Plaintiff and Respondent, v.
VINCENZO C., Defendant and Appellant.

**192**

COUNSEL

Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant and Appellant.

Law Office of Gradstein & Gorman, Marc Gradstein, Jane A. Gorman and Seth F. Gorman for Plaintiff and Respondent.

OPINION

KLINE, P. J.—Vincenzo C. and Molly V. are the teenage biological parents of A.S. After the baby's birth in New York, Molly arranged for her adoption by Kathryn S., who resides in California. Vincenzo appeals from an order terminating his parental rights, contending he should have been recognized as a presumed father with the right to block the adoption. He claims the trial court erred in failing to give full faith and credit to a New York paternity judgment, in finding he did not achieve presumed father status on the basis of his conduct during Molly's pregnancy and after A.S.'s birth, and in finding adoption and termination of appellant's parental rights to be in A.S.'s best interests. We affirm.

## STATEMENT OF THE CASE AND FACTS

Appellant and Molly met in 2010, in a high school class. On September 3, 2010, while Molly was staying at appellant's house for a few days due to problems she was having with her mother, Molly and appellant had sexual intercourse and Molly became pregnant. Molly testified that this was the only time she had ever had sexual intercourse with anyone.

Around the middle of September, when a pregnancy test came back positive, Molly immediately told appellant via Facebook. After the pregnancy was confirmed, appellant and his mother, Crystal, came to Molly's home to discuss the situation with Molly and her mother, Jill. Jill testified that they

discussed "all three options"—abortion, raising the child, and adoption—but mainly what Molly and appellant would have to do to keep the baby. According to Jill and Molly, Crystal said that "nobody was going to raise her grandbaby but her"; Crystal denied this. Crystal testified that she tried to offer things that would make it easier for Molly to afford keeping the baby, such as suggesting Medicaid and offering to pay for prenatal vitamins until Molly could get coverage and that appellant offered Molly help in the form of money or having Crystal watch the baby, "any way out so that she wouldn't get an abortion." Appellant testified he voiced his opposition to abortion, that most of the discussion was about what would be necessary to keep the baby, and that he offered Molly vitamins and money, and to be someone she could talk to. He also testified that he and Crystal suggested his taking custody if Molly felt she could not take care of the baby and he did not remember whether there was any discussion of Molly having custody of the child. Appellant, Crystal and Molly all testified that adoption was not discussed at the meeting. Molly acknowledged having posted a Facebook comment on September 25, saying she did not appreciate Crystal "threatening to try and take [her] baby away" if she decided to put it up for adoption, but testified that there were no actual conversations about adoption at that time.

Molly testified that she initially thought appellant was going to help her raise the baby; she had very strong feelings for him and thought he felt the same way about her. At the beginning of October, however, he suddenly "turned" on her, saying "mean" things such as that she had gotten pregnant on purpose and had slept with all the boys in school so he could not be sure the baby was his. In a Facebook e-mail, appellant told Molly he did not know if he loved her and he thought they should not be together anymore. He also "unfriended" her on Facebook sometime before October 21. Molly testified that he broke her heart.

She continued to try to be friendly with appellant, for the sake of the baby. He became more and more hostile and continued to call her nasty names. He told her he never wanted to see her or the baby again and that he was going to take the baby away from her. On October 21, appellant told her "that he didn't care if he had to lie to a judge, but he was going to say that I was not in my right mind and he was going to take the baby away from me and I was never going to see it again." Asked whether she responded to appellant by trying to hit him, Molly denied that she ever tried to hit appellant.

Molly was upset and posted some negative things about appellant on Facebook when she got home from school. These posts included, "Vinny [C.], you do not scare me. I do not have to put you on the birth certificate. So if you want to take my baby then you'll have to establish paternity first and that won't be cheap. Besides, the Court doesn't have to grant you the right to

see your baby, so ha, ha, ha, you think you've got me beat, boy, you have another thing coming." By October 21, appellant had already unfriended Molly, so she did not intend these posts to communicate anything to appellant, only to express herself. She did not think the friends who saw these posts would tell appellant about them.

Molly testified that she was under tremendous stress at this time and was having a difficult time in her relationship with her mother. People at school were telling her that appellant said the baby was not his and taunting her with things appellant had told them. Molly's grades began to decline and the situation became so painful that she went to a psychologist, who recommended "homebound schooling." On October 31, she and Jill had an altercation that resulted in her biting Jill, Jill calling the police and Molly being arrested, charged with assault and spending a number of days in juvenile detention; the charge was eventually dismissed.[1] From the end of October through the end of the school year, Molly did her schoolwork at home with a teacher coming after school a couple of times a week to bring her assignments, collect the completed ones and study with her. She returned to being an "A" student, but it was "incredibly" lonely.

Molly explained that while she no longer wanted a relationship with appellant, she did want him to participate in her pregnancy and never tried to avoid him or intentionally did anything to dissuade or prevent him from participating in the pregnancy or asserting his rights to the child. Appellant, however, never offered or gave her financial support, was not emotionally supportive after learning she was pregnant, and never discussed raising the baby jointly with her. Jill confirmed that, to her knowledge, Molly never received financial or emotional support from appellant or Crystal, and Molly never indicated to Jill that she had refused any offers of help from appellant or was trying to preclude him from participating in the child's life.

Appellant testified that he believed he was the father of Molly's baby from the time she told him she was pregnant, always acknowledged this, and never suggested to Molly or anyone else that he had any doubt about it; his father and a family friend also testified that appellant had always acknowledged that he was the father. Appellant testified that he never considered himself and Molly boyfriend and girlfriend, and never told her he was in love with her or wanted them to have a life together, then later acknowledged a letter he had written to her saying all these things. He stated that upon learning Molly was pregnant, he immediately took "the necessary steps to . . . assume responsibility as the father," along with his mother, offering "[p]renatal vitamins, money, going to doctor's appointments," but that Molly "didn't want to hear

---

[1] There were two court hearings on this matter. Crystal attended both and appellant attended one of them.

any part of it." Crystal, too, testified that she and appellant made it clear from the beginning that they were willing to help—they had offered to buy Molly prenatal vitamins, and offered physical, emotional and financial support—but Molly did not want anything from them and they soon started hearing that Molly was saying they were harassing her. Appellant did not get a job to help with the baby financially because he and his mother decided his education was more important at that time and his mother would help him financially.

According to appellant, initially after the meeting at her house he and Molly were getting along "okay," but their relationship started to deteriorate after the fight she had with her mother that resulted in her being arrested, and she dropped him as a friend on Facebook early in the pregnancy. Before this, he went on her page once a day and read her posts, including the ones about him, but he but did not recall whether she said she was upset over him not wanting to continue a relationship with her. When he was blocked from Molly's page, he kept track of her posts through friends' accounts. At least once or twice a week friends would tell him about Molly saying negative things about him on Facebook. This made him want to stay away from Molly, but he "wasn't going to completely stay away from my child." As a result of Molly's posts, people stopped talking to him and he was threatened by a friend of Molly's.[2] On one occasion, Molly mentioned going on the "Steve Wilco show for a DNA test"; appellant said he was not comfortable with this and she "stormed off." As he started to go to class, she followed and tried to punch him. Another time, when he told Molly he was interested in taking the baby, she had an "outburst" and told him he "wasn't going to see the baby again" and had not done anything to help. Appellant denied ever telling Molly he was going to take the baby from her or ever saying mean things about her.

On December 8, Molly invited appellant and his mother to a doctor's appointment to get his medical history because he had told her there were some "really bad genetic things on his side." Molly testified that appellant did not acknowledge, look at or speak to her. When the doctor asked for his medical history, Crystal began raising her voice, saying that Molly was a horrible person and had posted on the Internet that appellant raped her. Molly told Crystal they should leave if she was not going to help; they left without providing the medical information and Molly heard Crystal continuing to yell in the waiting room. Jill, who was in the waiting room, testified that Crystal was yelling that Molly always gets her way but "she won't once the baby is born." The staff suggested that Jill and Molly leave through a back door for

---

[2] Appellant testified that Molly's friend Mike "threatened to bash my army career and threatened to kill me once. And said how I was a jerk to quote, knock up his girlfriend when they weren't broken up yet."

their safety, and it was later suggested to Molly that for her safety it would be wise to check into the hospital anonymously when she gave birth.

Crystal denied refusing to answer the doctor's questions, testifying that Molly became upset and said she wanted them to leave after Crystal asked for clarification of a question. Appellant has a hereditary chronic condition called primary immune deficiency, for which he has to have an intravenous infusion every 21 days. Crystal testified that appellant's doctor had told her the condition could not be tested for in utero, so there was no need to bring it up with Molly's doctor. Appellant recounted that Molly "started to blow up" and yell when Crystal wanted to talk separately to the doctor about appellant's medical information, denied that Crystal became upset during the appointment, and testified that Jill yelled at Crystal while they were in the waiting area. Danielle Reaume, a friend who accompanied appellant and Crystal to the December 8 doctor's appointment, testified that Jill "verbally attacked" appellant and Crystal did not shout at Jill.

Molly testified that she did not see appellant after the doctor's appointment except at court hearings, and he did not call or e-mail her. She lived at the same address and had the same phone number and e-mail address; she did not have a cell phone until shortly before she gave birth in May 2011. Appellant said that he had contact with Molly "[m]aybe once or twice" after the doctor's appointment. He knew Molly had a home phone but did not know the number; he had been to her house only once but knew where it was; and his normal way of getting in touch with Molly was texting to her cell phone.[3]

Immediately after the doctor's appointment, Molly blocked appellant from her Facebook account. She began to think about adoption because, after that incident, she figured appellant was not "going to be there" for her and she did not think she could raise a baby by herself. She liked the idea of an open adoption that would allow her to participate in her child's life. Molly testified that the first time she discussed adoption was with her mother in late December, and Jill confirmed that before January they had been "working on [Molly] being a single mom."

In January 2011, Molly posted that she was going to give the baby up for adoption. In response, one of her friends asked, "How's the father?" Molly posted, "I don't know what Vinny is up to; he's kind of creepy; I try to avoid him at all costs." Appellant was told by friends that Molly was giving the baby up for adoption. Asked if he contacted her to say he did not want the baby adopted, appellant testified that he had no way to do so, then acknowledged that he had never tried to contact her to tell her of his opposition to

---

[3] This discrepancy might be explained by Crystal's testimony that Molly used an application that allowed for text messaging through her iPod.

adoption. Appellant testified that Molly had known from the start that he wanted to be part of the baby's life and "if she didn't want to be, I would take full custody of the baby."

On January 25, Molly found a prospective adoptive couple, Kathryn and Debra S., on Facebook that she believed could provide a stable and loving home. She immediately began to communicate with them. Three days later she posted on Facebook, "Ha, ha, ha, ha, ha, ha, ha, Vincenzo!!! [N]o matter what course of action you take regarding the paperwork you shall receive from the agency, I end up winning. The baby is going to have three moms."

Molly told Kathryn and Debra that the baby's father was "not in the picture" and, when asked by the adoption agency whether appellant would agree with the adoption, said she did not know. After acknowledging that when she received the adoption papers in March she posted on Facebook, "I seriously doubt that the father and his family are going to be happy about it," she explained that she had changed her mind after answering the agency's question because she remembered Crystal saying no one but her was going to raise the baby and realized this would rule out adoption. She did not think it was important to let the agency know about this change.

Annie Dostart, the caseworker who handled this case for the Independent Adoption Center (IAC), testified that on March 10 she mailed to appellant an IAC informational pamphlet for birth fathers and a medical history form, California Health and Human Services Agency form AD 67A. On March 22, she sent a packet of documents to a process server in New York to be served on appellant on an expedited basis. This packet included a letter of notice that appellant had been alleged to be the father of Molly's baby and that he would not receive further notice of adoption proceedings and would lose his parental rights if he did not take legal action within 30 days of the child's birth; a letter signed by Dostart outlining appellant's options (waiving further notice, denying paternity, relinquishing parental rights, seeking legal counsel) and asking to discuss them; forms for waiving further notice of adoption planning and for denying paternity; and the AD 67A birth father information document. On March 30, Dostart mailed a duplicate copy of the packet to appellant. Dostart was informed through IAC that the documents had been left on the door at appellant's residence, and she called Crystal in March and left a message on the answering machine with her name and number. She never received the medical history form back.

Appellant and Crystal testified that they consulted with a legal aid lawyer on March 31 about how get custody of the baby and were told they had to wait until the baby was born to file papers in court. The lawyer advised appellant to keep some distance from Molly so as not to risk her charging

them with harassment, because Molly had been claiming appellant and Crystal were harassing her. Having been told about Molly's Facebook posts stating that she was scared of him and his family, appellant worried about how she would react if he contacted her. Appellant did not remember the name of the attorney and had been unsuccessful in efforts to determine who it was.

Molly posted on Facebook in April that she was going to check in to the hospital anonymously so appellant would not be able to find her. Kathryn and Debra flew Molly and Jill out to California for three days and they all met with Dostart to discuss plans for the birth and made an agreement for annual visitation. At this meeting, Molly unblocked appellant from her Facebook account to help Dostart get in touch with him. She subsequently blocked him again after June 12.

Appellant had corrective surgery on his legs on April 4. About a month later, when he got home from the hospital, he received papers from the adoption agency that had been left taped to the front door. Appellant testified, however, that the packet of papers left at his home by the process server, and the one mailed to him, did not contain the notice and letter from Dostart that Dostart described sending, and that the informational pamphlet Dostart said she mailed to him came in the envelope left on his door, not in the mail. He did receive the waiver, denial of paternity and medical information forms. Crystal testified that they received papers inquiring about appellant's medical history but she was not aware of a notice of alleged father's rights and denial of paternity form, and that the documents that were left on the door were the only ones they received from IAC. The process server had previously tried to personally serve the papers on appellant, but refused to tell Crystal what they were or leave them with her.

Appellant testified that he was very concerned after reading the papers, but he followed his mother's advice not to contact the agency. At another point, he testified that because he was on medication that made him drowsy, forgetful and "loopy," he asked Crystal to help him deal with the papers and tell the agency he did not want the adoption, which he did not think could go forward without his signature. Crystal testified that she contacted the agency at the end of April, at appellant's request, and told the caseworker that she and appellant did not agree to the adoption. The caseworker told her that the only thing they could do was hire an attorney to contest the adoption and that the agency would send a kit to test appellant's DNA for paternity. Crystal testified that the caseworker did not tell her they could take any legal action before the baby was born, then subsequently testified that the caseworker said it would be better not to wait until after the baby was born to contest the adoption. They did not send back the agency paperwork because they did not agree to the adoption.

Dostart testified that Crystal's call was on May 24. According to Dostart, Crystal said she was not sure appellant was the father because Molly had been seeing another man at the same time; she asked whether it would be possible to do a paternity test and Dostart told her it was possible if everyone consented. Crystal also told Dostart that she had told Molly she (Crystal) wanted to raise the child, and that appellant had a chronic medical condition but she did not want to disclose his medical history until she knew appellant was the father. Crystal asked what she could do to contest the adoption and, after confirming that Crystal had the paperwork Dostart had sent, Dostart advised her to seek legal counsel and told her the chances would be better if they contested the adoption before the baby was born.

Kathryn testified that when Dostart told her and Debra about the conversation with Crystal, they were surprised and "a little bit happy" because, in keeping with their pursuit of an open adoption, they had hoped the father's family would "come forward" and want to be part of the baby's life; they were also "a little concerned" because Dostart said appellant might contest the adoption. Kathryn and Debra had seen some of Molly's Facebook postings that were negative toward appellant, including the one that said she doubted he would agree to the adoption, and were aware Molly was planning to check into the hospital anonymously, but they were not very concerned about the adoption going through because they had not heard from appellant or his family about whether they wanted to have a part in the baby's life. Kathryn testified that although she was seeking to terminate appellant's parental rights as part of the adoption process, she hoped he would want to be part of his daughter's life, for the child's benefit.

On May 24, Molly posted, "You will never get my baby. If we rate you with the family I found on a scale of one to ten, they are a billion and you are . . . negative infinity." Appellant saw the Facebook post and was sad that he would not be able to attend the birth of his child. He asked his mother to call each of the hospitals every day, and asked friends to help him find out what was going on. He did not personally call the hospitals because he was still on medication and his mother said she had tried to call. On May 31, appellant's family moved into a new house they had found in order to have room for the baby.

A.S. was born the last week in May 2011. Kathryn and Debra came to the hospital the next day and the baby left the hospital with them two days after her birth. Kathryn remained in New York with A.S. until June 22, waiting for the required paperwork for the Interstate Compact on the Placement of Children (ICPC; Fam. Code, § 7900 et seq.) to be approved. Molly signed the relinquishment papers on June 7.

Appellant testified that he learned that the baby had been born from a friend who informed his mother. The same day, at his request, Crystal contacted a lawyer. Appellant received paperwork for a custody petition and filled it out immediately. His petition for custody and paternity was filed on June 8, 2011. He testified that he was and always had been willing to sign a voluntary declaration of paternity form, which he understood to be a voluntarily made statement that he was the father of the child.

On June 12, five days after she signed the relinquishment papers, Molly received from appellant what she described as a "very cold and formal" e-mail asking to see the baby. She did not respond because the counselor from the adoption agency advised her not to. Molly told Kathryn about the e-mail, but Kathryn did not make any effort to arrange a visit for appellant because Molly said she had been advised not to respond to the e-mail and did not want them to; Kathryn and Debra realized that Molly did not want to have appellant involved at that time. Kathryn did not remember whether the adoption agency gave her any advice regarding appellant's e-mail and, once back in California, she never received information from anyone that appellant was requesting they return to New York so he could have a visit. Previously, Molly had told Kathryn that her alternative to adoption was to raise the baby by herself, because she felt appellant did not want to have anything to do with the baby. While still in New York, Kathryn was informed by IAC that appellant had filed a legal action for paternity. She and Debra did not inform anyone involved with the ICPC process about this, thinking they would know because their approval process involved looking into legal issues.

Appellant testified that when he learned from friends and Facebook that the child had left New York, he was "a complete wreck." He attended court hearings in New York, trying to get the child back, and when asked whether he was the father, he said that he was. The court did not order visitation for him.

On June 23, Kathryn and Debra filed an adoption request and a petition to terminate appellant's paternal rights in San Mateo County Superior Court. The adoption request form provided "yes" and "no" boxes to be checked after a statement that all persons with parental rights agreed to the adoption and had signed relinquishment forms; the "yes" box was checked and the space provided for the name and relationship of the person who had not signed a relinquishment was left blank.

Debra suddenly became ill in July and died on July 8. Molly signed a new relinquishment form on July 19, relinquishing the baby to the IAC and naming Kathryn as the prospective adoptive parent. The State Department of Social Services acknowledged receipt of Molly's relinquishment on July 26.

On July 22, Kathryn filed an application for a "Status Quo" order allowing the baby to remain in her custody, noting that there was a pending legal proceeding in New York in which appellant was seeking a custody order. At the hearing, appellant's New York attorney appeared by telephone, advised the court of hearings scheduled in New York on July 25 and August 9, and stated that appellant contested jurisdiction in California. The court granted the Status Quo order and appointed counsel to represent Molly, appellant and the baby.

On July 27, Molly posted on Facebook, "It is incredibly important that if anyone who ever heard Vinny say he wasn't the father to PLEASE . . . let me know so that I can let my baby get adopted." She also posted, "Again, if anyone remembers Vinny [C.] saying negative things about me, specifically that he's not the father, please, please, please, . . . let me know."

On August 3, Molly appeared at a hearing in New York and stated that appellant was the baby's father. On August 4, the New York Family Court entered an order of filiation adjudging appellant to be the father.

Over the course of several hearings in September and October, the parties disputed whether the matter should be heard in California or in New York, ultimately stipulating that it should go forward in California. The court heard the matter over several days from October 28 until December 9. At the conclusion of the evidence, the court rejected appellant's argument that the New York order of filiation gave him presumed father status in California; found he did not qualify as a presumed father under *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 [4 Cal.Rptr.2d 615, 823 P.2d 1216] (*Kelsey S.*); found adoption was in A.S.'s best interests; and terminated appellant's parental rights.

Appellant filed a timely notice of appeal on December 16, 2011.

## DISCUSSION

### I.

Appellant's initial argument is that the trial court erred in failing to accord him the status of presumed father on the basis of the New York order of filiation declaring his paternity. The trial court ruled that there was a "distinct difference" between an order of filiation, which simply establishes that the person who obtains the order is the biological father and avoids the need for a DNA test, and a California voluntary declaration of paternity, which elevates a father to presumed father status and gives him a right to block an adoption. According to appellant, the order of filiation was the equivalent of a

California voluntary declaration of paternity and should have been recognized as such under Family Code section 5604, which requires that full faith and credit be given to determinations of paternity made by other states.[4]

■ "In an adoption proceeding, '[w]hether a biological father is a "presumed father" . . . is critical to his parental rights.' " (*Adoption of Arthur M.* (2007) 149 Cal.App.4th 704, 718 [57 Cal.Rptr.3d 259], quoting *Kelsey S., supra*, 1 Cal.4th at p. 823.) Under California law, an unwed biological father has a right to withhold consent to adoption of a child only if he meets the definition of a "presumed father." (§ 8604, subd. (a).) " 'If a man is the presumed father of a child, the child cannot be adopted without his consent [citation], unless the trial court finds, on statutorily specified grounds, that he is unfit. [Citation.] If, however, he is not a presumed father of a child, the child can be adopted without his consent, and his parental rights can be terminated, unless the court determines it is in the child's best interest for him to retain his parental rights. [Citation.]' " (*Adoption of H.R.* (2012) 205 Cal.App.4th 455, 465 [140 Cal.Rptr.3d 327], quoting *Adoption of Daniele G.* (2001) 87 Cal.App.4th 1392, 1394–1395 [105 Cal.Rptr.2d 341].)

Section 7611 sets forth the ways in which a man can attain the status of presumed father: "A man is presumed to be the natural father of a child if he meets the conditions provided in Chapter 1 (commencing with Section 7540 [(presumption arising from birth of child during marriage)]) or Chapter 3 (commencing with Section 7570 [(voluntary declaration of paternity)]) . . ." or in specified other circumstances including marriage or attempted marriage to the mother under certain conditions, and having "receive[d] the child into his home and openly [held] out the child as his natural child."[5] The only one of the statutory means at issue in the present case is the voluntary declaration of paternity.

---

[4] All further statutory references are to the Family Code unless otherwise indicated.

Section 5604 provides: "A previous determination of paternity made by another state, whether established through voluntary acknowledgment procedures in effect in that state or through an administrative or judicial process shall be given full faith and credit by the courts in this state, and shall have the same effect as a paternity determination made in this state and may be enforced and satisfied in a like manner."

[5] Section 7611 provides in full: "A man is presumed to be the natural father of a child if he meets the conditions provided in Chapter 1 (commencing with Section 7540) or Chapter 3 (commencing with Section 7570) of Part 2 or in any of the following subdivisions:

"(a) He and the child's natural mother are or have been married to each other and the child is born during the marriage, or within 300 days after the marriage is terminated by death, annulment, declaration of invalidity, or divorce, or after a judgment of separation is entered by a court.

"(b) Before the child's birth, he and the child's natural mother have attempted to marry each other by a marriage solemnized in apparent compliance with law, although the attempted marriage is or could be declared invalid, and either of the following is true:

"(1) If the attempted marriage could be declared invalid only by a court, the child is born during the attempted marriage, or within 300 days after its termination by death, annulment, declaration of invalidity, or divorce.

In enacting the statutory provisions for establishing paternity through a voluntary declaration of paternity, the Legislature found "[t]here is a compelling state interest in establishing paternity for all children. Establishing paternity is the first step toward a child support award, which, in turn, provides children with equal rights and access to benefits, including, but not limited to, social security, health insurance, survivors' benefits, military benefits, and inheritance rights. Knowledge of family medical history is often necessary for correct medical diagnosis and treatment. Additionally, knowing one's father is important to a child's development." (§ 7570, subd. (a).) The Legislature further found that a "simple system allowing for establishment of voluntary paternity will result in a significant increase in the ease of establishing paternity, a significant increase in paternity establishment, an increase in the number of children who have greater access to child support and other benefits, and a significant decrease in the time and money required to establish paternity due to the removal of the need for a lengthy and expensive court process to determine and establish paternity and is in the public interest." (§ 7570, subd. (b).)

A voluntary declaration of paternity must be signed by both parents (after they have been provided with specified information on the legal consequences of the declaration), witnessed, and filed with the Department of Child Support Services (§§ 7571, 7572, 7574.)[6] With certain exceptions not relevant here, "a completed voluntary declaration of paternity . . . that has been filed with the

---

"(2) If the attempted marriage is invalid without a court order, the child is born within 300 days after the termination of cohabitation.

"(c) After the child's birth, he and the child's natural mother have married, or attempted to marry, each other by a marriage solemnized in apparent compliance with law, although the attempted marriage is or could be declared invalid, and either of the following is true:

"(1) With his consent, he is named as the child's father on the child's birth certificate.

"(2) He is obligated to support the child under a written voluntary promise or by court order.

"(d) He receives the child into his home and openly holds out the child as his natural child.

"(e) If the child was born and resides in a nation with which the United States engages in an Orderly Departure Program or successor program, he acknowledges that he is the child's father in a declaration under penalty of perjury, as specified in Section 2015.5 of the Code of Civil Procedure. This subdivision shall remain in effect only until January 1, 1997, and on that date shall become inoperative.

"(f) The child is in utero after the death of the decedent and the conditions set forth in Section 249.5 of the Probate Code are satisfied."

[6] Section 7571 states the requirements for obtaining and registering voluntary declarations of paternity.

Section 7574 sets forth the minimum requirements for the contents of the voluntary declaration of paternity.

A voluntary declaration of paternity signed by a minor parent or parents "shall not establish paternity until 60 days after both parents have reached the age of 18 years or are emancipated, whichever first occurs." (§ 7577, subd. (a).) Until that time, the voluntary declaration of paternity signed by a minor creates a rebuttable presumption of paternity. (§ 7577, subd. (c).)

Department of Child Support Services shall establish the paternity of a child and shall have the same force and effect as a judgment for paternity issued by a court of competent jurisdiction. The voluntary declaration of paternity shall be recognized as a basis for the establishment of an order for child custody, visitation, or child support." (§ 7573.)

Under New York law, the paternity of an unmarried father may be established either by an order of filiation adjudging him to be the father (N.Y. Family Court Act § 542) or by a voluntary acknowledgment of paternity signed by both parents, witnessed and filed with the registrar of births (N.Y. Pub. Health Law, § 4135-b). "An acknowledgment of paternity executed by the mother and father of a child born out of wedlock shall establish the paternity of a child and shall have the same force and effect as an order of paternity or filiation issued by a court of competent jurisdiction." (N.Y. Pub. Health Law § 4135-b3.(a).) This point is included in the information required to be provided to a person before he signs a voluntary acknowledgment of paternity; it is the statement that the acknowledgment "will have the same force and effect as a court order establishing paternity," that it will establish the duty of both parents to provide support for the child, and that it "may be the basis for the father to establish custody and visitation rights to the child, and may also be the basis for requiring his consent prior to an adoption proceeding." (N.Y. Dept. of Health form LDSS-4418.)

Appellant reasons that because a California voluntary declaration of paternity accords presumed father status, a New York order of filiation has the same legal effect as a New York voluntary acknowledgment of paternity, and California is required to give full faith and credit to a New York voluntary acknowledgment of paternity, his New York order of filiation must be viewed as giving him presumed father status. As we will explain, however, giving this effect to the New York paternity judgment would give appellant greater rights than a paternity judgment would provide in California, as well as greater rights than he would have had in a New York adoption proceeding, where an order of filiation or voluntary acknowledgment of paternity does not automatically give the father a right to block an adoption.

■ New York law requires consent to adoption from the father of a child born out of wedlock and placed for adoption at less than six months of age only if the father has "promptly" asserted his interest and manifested his "ability and willingness to assume custody of the child." (*In the Matter of Raquel Marie X.* (1990) 76 N.Y.2d 387, 402 [559 N.Y.S.2d 855, 559 N.E.2d 418, 424] (*Raquel Marie X.*); see *In re Seasia D.* (2008) 10 N.Y.3d 879, 880 [860 N.Y.S.2d 760, 890 N.E.2d 875, 876].) The considerations bearing on the determination whether he has done so include "his public acknowledgement of paternity, payment of pregnancy and birth expenses, steps taken to

establish legal responsibility for the child, and other factors evincing a commitment to the child." (*Raquel Marie X., supra*, 559 N.E.2d at p. 428; N.Y. Dom. Rel. Law § 111 1.(e).)[7] "The protected interest [of unwed fathers in a relationship with their children] is not established simply by biology. The unwed father's protected interest requires both a biological connection and full parental responsibility; he must both be a father and behave like one (*see*, Bartlett, *Re-Expressing Parenthood*, 98 Yale L.J. 293 [1988])." (*Raquel Marie X., supra*, at pp. 423–424.)

An order of filiation, which may be based solely on genetic testing (N.Y. Family Court Act § 532; *Oneida County Dept. of Social Services ex rel. Karen L. v. Amadeo* (N.Y.App.Div. 1995) 219 A.D.2d 834 [631 N.Y.S.2d 967]), establishes paternity (N.Y. Family Court Act § 542(a)). It is not sufficient to establish a father's right to prevent adoption of the child. (See *In the Matter of Lily R.* (N.Y.App.Div. 2001) 283 A.D.2d 901, 902–903 [724 N.Y.S.2d 231]; *Raquel Marie X., supra*, 559 N.E.2d at p. 424.)

 Similarly, a judgment of paternity in California does not, in and of itself, make a man a presumed father. "[C]ase law holds that in order to become a presumed father, a man 'must' fall within one of the categories set forth in Family Code section 7611. (*In re Vincent M.* [(2008)] 161 Cal.App.4th [943,] 954 & fn. 11 [74 Cal.Rptr.3d 755]; *Francisco G. v. Superior Court* [(2001)] 91 Cal.App.4th [586,] 595 [110 Cal.Rptr.2d 679]; *In re Zacharia D.* [(1993)] 6 Cal.4th [435,] 449 [24 Cal.Rptr.2d 751, 862 P.2d 751].) A prior paternity judgment is simply not one of the ways set forth in Family Code section 7611 that a man can achieve presumed father status. [¶] . . . A paternity judgment is, as the name implies, a judicial determination that a parent-child relationship exists. It is designed primarily to settle questions of biology and provides the foundation for an order that the father provide financial support. . . . Presumed father status, by contrast, is concerned with a different issue: whether a man has promptly come forward and demonstrated his ' "full commitment to his paternal responsibilities—emotional, financial, and otherwise." ' (*In re Jerry P.* [(2002)] 95 Cal.App.4th [793,] 801–802 [116 Cal.Rptr.2d 123].) We would endorse 'an interpretation that would lead to absurd consequences' if we were to conclude that a paternity judgment that is

---

[7] New York Domestic Relations Law section 111 1.(e), provides that the consent to adoption of the father of a child born out of wedlock and placed for adoption at less than six months of age is required "only if: (i) such father openly lived with the child or the child's mother for a continuous period of six months immediately preceding the placement of the child for adoption; and (ii) such father openly held himself out to be the father of such child during such period; and (iii) such father paid a fair and reasonable sum, in accordance with his means, for the medical, hospital and nursing expenses incurred in connection with the mother's pregnancy or with the birth of the child." *Raquel Marie X.* found the " 'living together' " requirement unconstitutional and set forth the standards to govern judicial determinations until such time as the legislature enacted new legislation. (*Raquel Marie X., supra*, 559 N.E.2d at pp. 426, 428.)

focused narrowly on biological and financial issues is determinative on subsequent issues that are unrelated to and far beyond its scope. (*In re M.B.* (2009) 174 Cal.App.4th 1472, 1477 [95 Cal.Rptr.3d 359].) We decline to read the applicable statutes in an absurd manner. (*Ibid.*)" (*In re E.O.* (2010) 182 Cal.App.4th 722, 727–728 [107 Cal.Rptr.3d 1].)

*In re Levi H.* (2011) 197 Cal.App.4th 1279 [128 Cal.Rptr.3d 814] (*Levi H.*) further confirms that a judgment of paternity and a voluntary declaration of paternity are not interchangeable in the manner appellant suggests. In that case, Andrew had signed a voluntary declaration of paternity shortly after Levi's birth; Michael, who subsequently married Levi's mother, claimed presumed father status under section 7611, subdivision (d), based on his having received the child into his home and held him out as his son. (*Levi H.*, at pp. 1283–1284.) Michael argued that the two presumptions should be weighed against each other, as provided in section 7612, subdivision (b), when two or more presumptions arise under section 7611.[8] (*Levi H.*, at p. 1288.) According to Michael, since section 7573 states that a voluntary declaration of paternity has the same force and effect as a judgment of paternity, and *In re E.O., supra*, 182 Cal.App.4th at page 727 held that a judgment of paternity is not one of the ways presumed father status can be achieved under section 7611, a voluntary declaration of paternity is also insufficient for this purpose. (*Levi H.*, at pp. 1289–1290.) *Levi H.* rejected Michael's argument that " '[t]here is no practical difference between a paternity judgment rendered in a child support matter and a voluntary declaration of paternity executed by a man at the hospital' " because the two are treated differently by statute: Unlike a paternity judgment, a voluntary declaration of paternity is an express basis for presumed father status under section 7611, and section 7612, subdivision (a), excludes this presumption from its list of rebuttable presumptions of paternity.[9] (*Levi H.*, at p. 1290.)

Appellant urges that his position is supported by *In re Mary G.* (2007) 151 Cal.App.4th 184 [59 Cal.Rptr.3d 703], a termination of parental rights case which held that a father who had executed a voluntary affidavit of paternity at the time of the child's birth in Michigan must be accepted in California as a presumed father entitled to reunification services. The trial court had denied presumed father status because the Michigan affidavit was not made on a California form or filed with the Department of Child Support Services as

---

[8] Section 7612, subdivision (b), provides: "If two or more presumptions arise under Section 7610 or 7611 that conflict with each other, . . . the presumption which on the facts is founded on the weightier considerations of policy and logic controls."

[9] Section 7612, subdivision (a), provides: "Except as provided in Chapter 1 (commencing with Section 7540 [(birth of child during marriage)]) and Chapter 3 (commencing with Section 7570 [(voluntary declaration of paternity)]) of Part 2 or in Section 20102, a presumption under Section 7611 is a rebuttable presumption affecting the burden of proof and may be rebutted in an appropriate action only by clear and convincing evidence."

required by section 7574, although if the baby had been born in California, the identical form the father signed in Michigan would have qualified him as a presumed father. (151 Cal.App.4th at p. 198.) *In re Mary G.* reversed, concluding the father had to be treated as a presumed father under constitutional equal protection principles, because he was similarly situated to fathers who voluntarily acknowledged paternity in California. (*Id.* at p. 199.) The same conclusion was required by section 5604, which "broadly states an out-of-state paternity declaration is entitled to full faith and credit and 'shall have the *same effect* as a paternity determination made in this state.' (Italics added.) A voluntary paternity acknowledgment made in California has the *effect* of giving the father presumed father status. . . . We conclude Family Code section 5604 is applicable, and regardless of the lack of a 'presumed' father category in Michigan, that state's paternity acknowledgment is entitled to full faith and credit in California, meaning it qualifies Frank for presumed father status and reunification services as a matter of right." (151 Cal.App.4th at p. 203.)

██ Unlike the father in *In re Mary G.*, however, appellant did *not* execute a voluntary acknowledgment of paternity in New York. Instead, he obtained a paternity judgment from the court. His argument is based on the fact that New York law gives the voluntary acknowledgement "the same force and effect" as a court judgment of paternity. (N.Y. Pub. Health Law § 4135-b3.(a).) But this much is true in California as well: A voluntary declaration of paternity has "the same force and effect as a judgment for paternity issued by a court of competent jurisdiction." (§ 7573.) Nevertheless, in California, it is clear that while a voluntary declaration of paternity has the same effect as a paternity judgment, the converse is *not* true: As discussed above, a judgment of paternity does *not* automatically make the father a presumed father with rights to veto an adoption. In New York neither a paternity judgment nor a voluntary acknowledgment of paternity automatically gives the father such veto rights. Appellant may be correct that under New York law he had no incentive to follow one rather than the other of the two courses to establishing his paternity. But under California law, there is a definite distinction—one means of establishing paternity also creates presumed father status, the other does not. ██ Giving full faith and credit to the New York Order of Filiation under section 5604 requires a California court to give it the effect a California paternity judgment would have. It does not require a California court to give the New York order *greater* effect than the same order would have if issued by a California court.[10]

---

[10] Respondent urges that even if the order of filiation could be viewed as having the effect of a voluntary declaration of paternity, appellant's consent to the adoption was not required because the order of filiation was made after Molly's relinquishment was final. Section 8604, subdivision (a), provides that if a man becomes a presumed father through a voluntary declaration of paternity, his consent is required before a child can be adopted only if he

## II.

■ Appellant also challenges the trial court's conclusion that he was not a presumed father under *Kelsey S., supra,* 1 Cal.4th 816. *Kelsey S.* established that a natural father who does not have a right to block a third party adoption as a presumed father under section 7611 may nevertheless have a constitutional right to do so. (*Kelsey S.,* at p. 849; *Adoption of Michael H.* (1995) 10 Cal.4th 1043, 1052 [43 Cal.Rptr.2d 445, 898 P.2d 891].) In *Kelsey S.,* the unwed mother sought to place the child for adoption; the natural father sought custody of the child but was prevented from achieving the status of presumed father under the provisions of what is now section 7611, subdivision (d), because he was prevented from receiving the child into his home. (*Kelsey S.,* at pp. 822, 825.) The court held that the statutory scheme "violates the federal constitutional guarantees of equal protection and due process for unwed fathers to the extent that the statutes allow a mother unilaterally to preclude her child's biological father from becoming a presumed father and thereby allowing the state to terminate his parental rights on nothing more than a showing of the child's best interest." (*Id.* at p. 849, italics omitted.)

The *Kelsey S.* court held that " '[a] father who has promptly taken every available avenue to demonstrate that he is willing and able to enter into the fullest possible relationship with his under-six-month-old child should have an equally fully protected interest in preventing termination of the relationship by strangers, even if he has not as yet actually been able to form that relationship.' " (*Kelsey S., supra,* 1 Cal.4th at pp. 838–839, quoting *Raquel Marie X., supra,* 559 N.E.2d at p. 425.) "If an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities— emotional, financial, and otherwise—his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent. Absent such a showing, the child's well-being is presumptively best served by continuation of the father's parental relationship. Similarly, when the father has come forward to grasp his parental

becomes a presumed father "before the mother's relinquishment or consent [to adoption] becomes irrevocable or before the mother's parental rights have been terminated." (§ 8604, subd. (a).) A voluntary relinquishment to a licensed adoption agency "becomes final 10 business days after receipt of the filing by State Adoptions or when State Adoptions sends written acknowledgment of receipt, whichever is earlier (unless a longer period for finality is necessary due to causes beyond the control of State Adoptions)." (*In re R.S.* (2009) 179 Cal.App.4th 1137, 1146, fn. 3 [101 Cal.Rptr.3d 910]; see § 8700, subd. (e)(1).) Molly signed her relinquishment to Kathryn S. on July 19, 2011, and the State Department of Social Services confirmed receipt of the relinquishment on July 26; the New York order of filiation was filed on August 4, 2011. Appellant counters that Molly did not have a right to sole custody when she signed the relinquishment because he had already begun proceedings to establish his parental rights by filing his custody petition on June 8. Given our conclusion above, we need not resolve this issue.

responsibilities, his parental rights are entitled to equal protection as those of the mother." (*Kelsey S., supra*, at p. 849.)

 "A court should consider all factors relevant to that determination. The father's conduct both *before and after* the child's birth must be considered. Once the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit. In particular, the father must demonstrate 'a willingness himself to assume full custody of the child—not merely to block adoption by others.' (*Raquel Marie [X.], supra*, 76 N.Y.2d at p. 408 [559 N.E.2d at p. 428].) A court should also consider the father's public acknowledgement of paternity, payment of pregnancy and birth expenses commensurate with his ability to do so, and prompt legal action to seek custody of the child." (*Kelsey S., supra*, 1 Cal.4th at p. 849, fn. omitted.)

"The burden is on a biological father who asserts *Kelsey S.* rights to establish the factual predicate for those rights." (*Adoption of O.M.* (2008) 169 Cal.App.4th 672, 679 [87 Cal.Rptr.3d 135].) We review the trial court's decision under the substantial evidence test, viewing "all factual matters most favorably to the prevailing party and in support of the judgment, indulging all reasonable inferences and resolving all conflicts accordingly." (*Adoption of Arthur M., supra*, 149 Cal.App.4th at p. 717; see *Adoption of O.M.*, at pp. 679–680.)

Appellant contends that he tried to assume his parental responsibilities but was thwarted by Molly. According to appellant, he immediately acknowledged he was the father and wanted the opportunity to be a father, and opposed abortion and adoption; he extended offers of help, and attended Molly's court hearing out of concern for his child; he sought legal advice during the pregnancy but was given bad advice to wait until the child's birth before taking legal action; he filed his petition for custody immediately upon learning of the birth; and he contacted Molly asking to see the baby but received no response. Molly, appellant asserts, got angry at him, made clear to everyone her intention to cut him off from any involvement in the pregnancy or birth, made it impossible for him to respond to her Facebook posts by deleting him as a friend on her account, told the adoption agency she did not know whether he wanted the baby when in fact she knew he did, checked into the hospital anonymously to give birth, and allowed the baby to be taken away from New York despite knowledge of appellant's opposition to the adoption. Emphasizing the statement of the *Kelsey S.* court that an unwed father must " '*attempt* to assume his parental responsibilities *as fully as the mother will allow and his circumstances permit*' " (see *Kelsey S., supra*, 1 Cal.4th at p. 849, italics added by appellant), appellant maintains he satisfied the test.

The trial court, as evident in its detailed explanation of its reasons for finding appellant was not a *Kelsey S.* father, saw the situation differently. The court explained the reasons for finding appellant was not a *Kelsey S.* presumed father in great detail, ultimately concluding that "even seen in the light most favorable to the birth father, . . . it cannot be said by a preponderance of the evidence that he was fully committed to his parental responsibility" and there was insufficient evidence "of a willingness of [appellant] himself to assume full custody of the child, not merely to block the adoption." The court found "a complete absence" of evidence that appellant communicated to Molly his willingness to support her emotionally or financially, or his commitment to raising his child, and not much "significant effort[]" by appellant to "assume the mantle of responsibility for being a father." It saw Molly as "a 16-year-old spurned lover who got pregnant by accident," felt she had been "very rudely dropped once she . . . became pregnant," and abandoned by someone who only weeks before had "professed his undying love for her." The court viewed her Facebook posts in this light, and found that her alleged assault on appellant did not excuse appellant's "complete lack of contact" with her. Appellant could have posted on Facebook or used friends to get messages to Molly, and the fact that he and Crystal went to Molly's home in September and to her court appearances showed that they were able to "take concerted efforts when they want to," raising questions about the absence of contact from December until June. Appellant and Crystal's failure to provide information to Molly's doctor, and later the adoption agency, about appellant's congenital medical condition raised questions about appellant's seriousness about being a father. The court found that appellant and his family were aware of Molly's Facebook posts but did nothing legally or directly with Molly (aside from one Facebook post) to indicate they were opposed to the adoption, and found appellant's "laissez faire attitude" "very unusual" for a father who "really wants to have his child and raise his child in his care."

The court made express credibility findings. It found in favor of Dostart's credibility, particularly noting her description of Crystal expressing doubt as to whether appellant was in fact the baby's father, which the court saw as a possible explanation of why the family did not actively seek custody before the birth. The court found that appellant's family received the adoption papers, and believed Dostart's testimony that she advised Crystal to file legal action before the birth.

The court found Molly credible and "overall" truthful. It acknowledged she might have been "less than candid" in not stating on the adoption paperwork that appellant would not be happy about the adoption, but concluded this did not really matter because it was the agency's responsibility to make sure the alleged father knew about the adoption proceedings and the agency took the steps it was supposed to in this regard.

The court also found appellant "overall" credible, but found there was ambivalence as to whether he really wanted to be the father, noting that even when testifying about his attachment to the baby and his tears over her, "his demeanor was very flat and calm and unemotional," and finding it "curious" that appellant's actions were not consistent with someone who desperately wanted custody of his child and wanted to protect the child from what he saw as "a very unstable, erratic, violent mother." While Crystal made clear her commitment to raising the baby, the court found parts of her testimony were not credible. Noting that appellant's testimony indicated he looked to his mother to make decisions suggested Crystal might have been making decisions on behalf of the family, the court emphasized that the law required it to determine whether appellant himself had assumed the responsibilities of parenthood.

The evidence supports the court's findings and conclusions. The trial court was entitled to accept Molly's testimony that she wanted appellant to be involved with the pregnancy and did not prevent him from having contact with her, and to view her expressions of anger at appellant as the reaction of an emotional teenager in a difficult situation that did not excuse appellant's failure to make his interest in the child clear. After Molly prevented appellant from having direct access to her Facebook page, he kept himself informed through mutual friends; there is no apparent reason he could not have communicated his wishes concerning the child through these friends, or contacted Molly by phone or at her home. The excuse he offered—that his lawyer advised him to keep his distance from Molly for fear of a harassment claim—at best could only have explained his conduct after he saw the lawyer on March 31, but the evidence showed no contact after the doctor's appointment in December, despite appellant's knowledge of Molly's plans for adoption. As the trial court said, appellant's failure to reveal information about his congenital condition casts doubt upon his professed concern for the well-being of his unborn child, notwithstanding Crystal's explanation that appellant's doctor told them there was nothing to be done about it during the pregnancy; withholding this information prevented Molly and her doctor from being able to evaluate the significance of the condition and investigate whether there were any steps to be taken.

Appellant offers *In re D.A.* (2012) 204 Cal.App.4th 811 [139 Cal.Rptr.3d 222] and *Adoption of H.R., supra,* 205 Cal.App.4th 455 as supporting his position. *In re D.A.* was a dependency case in which the mother had told each of two men that he might be the biological father. C.R. said he wanted to have a paternity test as soon as the baby was born and, despite the uncertainty about parentage, C.R. offered to help with any expenses associated with the pregnancy, birth or baby, and took the mother to two doctor's visits. (*Id.* at p. 814.) The mother then disconnected her phone, leaving C.R. no means of contacting her directly, and his repeated attempts to reach her through the

maternal aunt were unsuccessful. (*Id.* at pp. 814–815.) After the baby was born, the mother contacted C.R. and he begged to see her and the baby. He asked for a paternity test, but she repeatedly put off having it done. (*Id.* at p. 815.) The child was then detained after a physical altercation between the mother and E.A. in which one of the mother's blows hit the child, whom E.A. was holding. (*Id.* at pp. 815–816.) Paternity testing determined that C.R. was the biological father and he proceeded to attend all court hearings, request visitation and move for presumed father status. (*Id.* at p. 818.) Reversing the trial court's denial of this motion, the *In re D.A.* court noted that C.R. had immediately requested a paternity test and helped during the pregnancy despite the uncertainty that he was the father, stopping only when the mother cut him off and prevented further contact; that he again requested paternity testing as soon as the mother made contact; and that he began efforts to form a relationship with the child as soon as his paternity was established. (*Id.* at pp. 824–825.)

Here, appellant knew from the beginning of the pregnancy that he was the father, but the trial court found "a complete absence" of evidence that he communicated to Molly his willingness to support her emotionally or financially, or his commitment to raising his child. The trial court rejected appellant's argument that Molly prevented him from being able to contact her and found appellant's "laissez faire attitude" "very unusual" for a father who "*really wants to have his child and raise his child in his care.*"

Appellant relies upon *Adoption of H.R.* for the principle that a father's failure to provide financial support to the mother and child is not dispositive but only one factor to be considered in determining whether a natural father can claim *Kelsey S.* rights. The father in *Adoption of H.R.* lived with the mother for a few weeks; when the mother moved out, then they continued to spend 40 to 90 percent of their nights together. (*Adoption of H.R., supra,* 205 Cal.App.4th at p. 458.) The father wanted to get married and they put downpayments on wedding rings, then the mother withdrew the money. (*Ibid.*) The father accompanied the mother to medical appointments during the pregnancy and obtained copies of sonograms, and failed to attend these appointments only when prevented by the mother, who ended the relationship and blocked him from receiving further information about the baby. (*Id.* at p. 468.) He filed a petition to establish a parental relationship shortly after being excluded from one of the medical appointments. (*Id.* at p. 459.) The father lived in a house where he had provisions for the child, and after the child was born he visited as regularly as permitted. (*Ibid.*) In upholding the trial court's determination that he was a *Kelsey S.* father, the *Adoption of H.R.* court acknowledged the trial court's finding that the father did not support the mother financially or emotionally during the pregnancy, but viewed this as only a factor to be considered. (*Id.* at p. 470.)

Appellant emphasizes that he was 16 years old, unemployed, recovering from major surgery and dependent upon his mother for financial support, and that Molly never requested financial assistance from him. As the trial court made clear, however, the lack of financial support was only one factor the court considered. As indicated above, the court found Molly's behavior insufficient to excuse appellant's lack of contact during the pregnancy, found "a complete absence" of evidence that appellant communicated to Molly his willingness to support her emotionally or financially, or his commitment to raising his child, and few significant efforts by appellant to "assume the mantle of responsibility for being a father," and found appellant's "laissez faire attitude" inconsistent with a father truly wanting to raise his child.

Appellant also contrasts his situation with that of the fathers whose *Kelsey S.* claims were rejected in *Adoption of Arthur M., supra*, 149 Cal.App.4th 704 and *Adoption of O.M., supra*, 169 Cal.App.4th 672. The parents in *Adoption of Arthur M.* were teenagers who conceived the child after a single sexual encounter. When the mother told the father in a phone call that she was pregnant, he offered no emotional or financial support and told the mother, "[w]ell, good luck with that"; subsequently, he repeatedly pressed her to have an abortion, including an incident in which he grabbed her arm and tried to pull her out of her house, was verbally abusive toward her, and threatened her if she did not have an abortion. (*Adoption of Arthur M.*, at pp. 708–709.) He provided no emotional or financial support during the pregnancy, four months into which he moved out of state to attend college, and did not further communicate with the mother except for one brief telephone conversation. (*Id.* at pp. 709–710.)

In *Adoption of O.M.*, the father failed to provide any material support during the first months of the pregnancy because he engaged in criminal conduct that resulted in his being incarcerated for four months shortly after the pregnancy was confirmed. (*Adoption of O.M., supra*, 169 Cal.App.4th at pp. 675–676.) After his release, the mother resumed a different relationship and refused to see him; he made some attempt to find her but did not attempt to communicate with her or provide money or material support through friends. (*Id.* at pp. 676, 681.) Although he attempted to consult an attorney when he learned the mother was planning to place the baby for adoption, the day before his scheduled appointment he was arrested for drug and weapons violations (alleged to have been committed that day) and again incarcerated. (*Id.* at pp. 677, 681.) The *Adoption of O.M.* court concluded that he did not make "any significant effort . . . to assume the mantle of responsible fatherhood notwithstanding [the mother's] repudiation of him." (*Id.* at pp. 680–681.)

These cases do nothing to bolster appellant's argument. That he did not push Molly to have an abortion or commit crimes resulting in incarceration simply does not demonstrate that he acted in the manner *Kelsey S.* demands.

*Adoption of Michael H., supra,* 10 Cal.4th at page 1060, clarified that the constitutional protection of *Kelsey S.* requires evidence that a natural father "*promptly* came forward and demonstrated as full a commitment to his parental responsibilities as the biological mother allowed and the circumstances permitted within a *short time* after he learned or reasonably should have learned that the biological mother was pregnant with his child." (Italics added.) There, the father learned of the pregnancy in July and beginning in November made "impressive" efforts to assume his parental role, including seeking legal advice, contacting the media, requesting assistance from local political figures, researching the law himself, and filing a custody petition in Arizona (where he and the mother lived when they were together and the baby was conceived) before the child was born. (*Id.* at pp. 1048, 1053, fn. 3.) In early March, he found an attorney who would take his case free, the attorney immediately contacted the prospective adoptive parents and learned the baby had been born a bit more than a week before, and the father immediately asked for custody, sent out birth announcements and bought baby clothes and equipment. (*Id.* at p. 1049.) However, in the early months of the pregnancy, the father had first suggested abortion, then agreed to adoption and researched agencies with the mother, and until the date he learned from his attorney that the baby had been born, the father continued to speak with the mother and the prospective adoptive parents she had committed to as though he still agreed with the adoption plan. (*Id.* at p. 1053.)

The trial court in the present case noted that appellant's efforts were not "anything close" to those found insufficient in *Michael H.,* and we agree. Appellant points to ways in which his conduct did not suffer the deficiencies found by the *Michael H.* court: He never suggested abortion, did not initially agree to adoption, and did not mislead the mother and prospective adoptive parents by continuing to support the plan after changing his mind. Because he did not conceal his objection to adoption during the pregnancy, he argues, this case does not present the problem, discussed in *Michael H.,* of potential emotional damage to the child and prospective adoptive parents where adoptive parents take custody of a child at birth believing they have the father's consent, then after a long period of time have to give up the child. Here, the prospective adoptive parents took custody of the baby knowing that appellant might oppose the adoption and left New York with her despite knowledge that appellant had filed a paternity petition.

The fallacy in appellant's argument is his portrayal of the facts as he would like them seen rather than as the trial court found them. Appellant claims he

expressed his wish to raise the baby when he first learned of the pregnancy, and did everything reasonable under the circumstances to "fully commit himself to his child" and "assert his responsibilities" but was thwarted by Molly. As we have said, the evidence supports the trial court's contrary conclusion.

## III.

■ Where a natural father does not have presumed father status under section 7611 or a constitutional right to block an adoption under *Kelsey S.*, " 'the child can be adopted without his consent, and his parental rights can be terminated, unless the court determines it is in the child's best interest for him to retain his parental rights. [Citation.]' " (*Adoption of H.R., supra,* 205 Cal.App.4th at p. 465, quoting *Adoption of Daniele G., supra,* 87 Cal.App.4th at pp. 1394–1395.) Section 7664, subdivision (b), provides that if the natural father claims parental rights, "the court shall determine if he is the father. The court shall then determine if it is in the best interest of the child that the father retain his parental rights, or that an adoption of the child be allowed to proceed. The court, in making that determination, may consider all relevant evidence, including the efforts made by the father to obtain custody, the age and prior placement of the child, and the effects of a change of placement on the child." "If the court finds that it is in the best interest of the child that the father should be allowed to retain his parental rights, the court shall order that his consent is necessary for an adoption. If the court finds that the man claiming parental rights is not the father, or that if he is the father it is in the child's best interest that an adoption be allowed to proceed, the court shall order that the consent of that man is not required for an adoption. This finding terminates all parental rights and responsibilities with respect to the child." (§ 7664, subd. (c).)[11]

Expert testimony on the question of A.S.'s best interests was supplied by means of declarations. Dr. Frederica Conrad, a licensed psychologist and Kathryn's expert witness, observed A.S. and Kathryn for two hours when A.S. was four and one-half months old, and again when A.S. was almost six months old. She stated that although it was not possible to define an infant as securely attached before 12 months of age, she saw signs that a secure attachment was forming with Kathryn. Conrad opined that if removed from Kathryn, A.S. would "suffer s[h]ort term effects such as behavioral

---

[11] Section 7664 was amended in 2011, effective January 1, 2012. (Stats. 2011, ch. 462, § 2.) At the time of the trial court proceedings in the present case, the substance of section 7664, subdivisions (b) and (c), as quoted in the text, was contained in a single subdivision of the statute, denominated subdivision (b). (Stats. 2011, ch. 462, § 2.)

disorganization, distress emotionally and regression in her developmental milestones," that "[w]hile long-term adjustment is variable and some infants do adjust over time, there is no guarantee this will happen for this individual infant" and that in Conrad's experience, "negative outcomes due to disruption in caretaking and changes in home placement are not infrequent." Acknowledging that long-term adjustment problems from removal were more variable than short-term ones, Conrad stated that the "general rule" was that an infant forming a good attachment should not be moved unless absolutely necessary. Conrad acknowledged that adoption posed some risks for a child but opined that "open adoption generally carries fewer risks relative to the child's identity formation and positive adjustment." Conrad concluded, "Any disruption in the current placement arrangement for [A.S.] would produce short and long term negative outcomes relative to continued development. There is reason to suggest that [A.S.] would suffer shortterm disruption, regression and insecurity. More long-term [effects] could include relationship insecurity, delays in cognitive development and self-regulation and mood disorders."

Appellant's expert, Dr. David Brodzinsky, did not observe A.S. Responding to the conclusions Conrad reached after her first observation,[12] he declared that a four-to-five-month-old child is still developing attachment, attachment cannot be reliably assessed until six to eight months of age, and Conrad provided little evidence to support her conclusion that A.S. was securely attached to Kathryn. According to Brodzinsky, most children separated from a primary caregiver in the first year of life do not display long-term developmental disruptions, and Conrad did not adequately discuss the many factors that affect the long-term consequences of such disrupted attachments. Brodzinsky pointed to risks associated with adoption placements, such as loss of birth parents and extended family and not "fitting in," and opined that when A.S. came to realize that her father had opposed her placement, she might believe she had been "taken" from him, which could undermine her relationship with her adoptive parent. Brodzinsky recommended that if A.S. was placed with appellant, a transition plan should be developed and appellant should be urged to seek professional counseling to assist in the transition, and that if A.S. was to remain in her current placement, the parties should consider an open adoption arrangement. Brodzinsky later reviewed Conrad's second declaration and found nothing in it to alter his opinions.

---

[12] Dr. Conrad's declaration, exhibit No. 7, refers to her having filed an earlier declaration concerning her first observation. This earlier declaration does not appear to be part of the record on appeal and neither of the parties cites to it. Dr. Brodzinsky's declaration states that Conrad opined that the baby was "strongly and securely attached" to Kathryn, and, if removed from Kathryn's care, would suffer "immediate and severe stress, and long-term developmental setbacks, and loss of predictability and security, which could lead to mood disorders like depression or defensiveness around future attachment opportunities throughout her life."

In addition to the experts' opinions, Molly expressed her view that adoption was the best arrangement for A.S. but testified that if the court did not allow the adoption, she would request custody. To this end, she had applied to a college that had a campus daycare center for students and staff, and her grandfather had established a trust fund to pay for college. Kathryn believed adoption was in A.S.'s best interests because the baby had been with her for six months and saw Kathryn as her mother, Kathryn saw A.S. as her daughter and loved her, Molly had wanted the adoption, and Kathryn was in close contact with Molly and Jill, whom she saw as part of her extended family. Dostart, whose agency is regularly required to make best interests recommendations to the court, concluded from her observation of Kathryn and A.S. that A.S. was "thriving in a safe and healthy home with Kathryn" and adoption was in her best interests.

Appellant testified that if he was given custody, he would look for a job and continue school, and would have support from his friends and family, including having his mother watch the baby when he was at work and school. He acknowledged that removing A.S. from Kathryn's care would be "a little strange and unusual at first," but thought that because she was just a baby, A.S. would "get used to it in time," and he would be willing to participate in services if necessary to help make the transition easier. Crystal, who planned to continue being a stay-at-home mother, confirmed that she would be available to care for A.S. and had a room set aside for her. Crystal, appellant's father and a family friend each attested to appellant's experience and ability to care for younger children, as evidenced by his babysitting and otherwise caring for his younger sister and the friend's young son. His father expressed his willingness to support appellant indefinitely in caring for A.S., including having made sure in a recent housing decision that he had extra rooms available.

The trial court concluded that it was in A.S.'s best interests to remain with Kathryn. Its detailed explanation of its reasoning began with the statement that then six-month-old A.S. had been in Kathryn's home since birth and there was no evidence she was not healthy and thriving. The court found that Kathryn's ability to provide love, nurturance and security to A.S.—despite Debra's sudden death—demonstrated Kathryn's resilience. The court found that appellant, although mature for his age, "came late to the party." It recognized that appellant had an extensive support network with the ability to support A.S., but was concerned about Molly's testimony that she would seek custody if the adoption did not go through, and the complications A.S. would face if a court gave both birth parents custody, as the parents grew up and went separate ways in their lives. The court noted that Dr. Brodzinsky,

appellant's expert, never said it would be detrimental for A.S. to remain with Kathryn and that Brodzinsky's main concern was that it could be challenging when A.S. came to realize that her father wanted and fought for her custody, and emphasized that Kathryn had chosen to pursue an open adoption and actively wanted A.S. to know her birth father.

It was appellant's burden to prove that A.S.'s best interests would be served by allowing him to retain his parental rights and not permitting the adoption to proceed. (*Adoption of Alexander M.* (2001) 94 Cal.App.4th 430, 438 [114 Cal.Rptr.2d 218]; *Kelsey S., supra,* 1 Cal.4th at p. 825.) We must determine whether substantial evidence supported the trial court's findings and whether it abused its discretion in determining that it was in A.S.'s best interests to terminate appellant's parental rights and proceed with the adoption. (*Adoption of Myah M.* (2011) 201 Cal.App.4th 1518, 1542 [135 Cal.Rptr.3d 636] [petition for adoption under Prob. Code; appellate court looks to "whether the [trial] court abused its discretion in applying the law and whether substantial evidence in the record supported its finding that adoption is in the child's best interests"]; *In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32 [51 Cal.Rptr.2d 444, 913 P.2d 473] [child custody and visitation orders reviewed for abuse of discretion; decision supported by substantial evidence on "best interest[s]" of children].)

■ Appellant's argument is largely based on the importance of the biological tie between a father and his child. He quotes *Lehr v. Robertson* (1983) 463 U.S. 248, 262 [77 L.Ed.2d 614, 103 S.Ct. 2985] (*Lehr*): "The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development." But *Lehr* also confirmed that "the mere existence of a biological link does not merit equivalent constitutional protection." (*Id.* at p. 261.) "The biological connection between father and child is unique and worthy of constitutional protection if the father grasps the opportunity to develop that biological connection into a full and enduring relationship." (*Kelsey S., supra,* 1 Cal.4th at p. 838.)

Although the question in the context of the best interests analysis is no longer one of constitutional magnitude, a natural father's failure to take prompt action to accept the opportunity of parenthood similarly undercuts his position. Section 7664 directs the court making a best interests determination to consider factors including "the efforts made by the father to obtain custody." We have already determined that appellant did not demonstrate the prompt and full commitment required under *Kelsey S.*

In this context, too, appellant's claim depends upon acceptance of his contention that he was prevented from participating in the pregnancy, birth or decision about adoption. Having rejected that contention, we are left with an unwed father who did not make clear his intention to seek custody of his child until after her birth, and whom the trial court found to be ambivalent in his commitment. On the other hand, at the time of the trial court proceedings, A.S. had been living in a stable home with a loving adoptive mother for all of her six months of life. The declaration of the expert who observed Kathryn and A.S. described the likely short- and long-term negative consequences of removing A.S. from her adoptive home. While appellant's expert found these risks less significant, he did not (as the trial court noted) describe any detriment to A.S. in remaining with Kathryn.

We cannot agree with appellant's argument that the trial court placed undue weight on Kathryn's hardship in losing her spouse, the possibility of a custody battle between appellant and Molly, or the uncertainty of the natural parents' futures, to the exclusion of "other more relevant factors." The "other factors" appellant addresses are the importance of his biological tie to A.S., appellant's maturity and the support he would have from his mother in raising the child (both recognized by the trial court), and the speculative nature of the assumption that there would be a custody battle over A.S. or that the uncertainty of the natural parents' futures would be problematic for the child.

The significance of the biological tie, as we have said, was undercut by appellant's failure to "grasp[] the opportunity" (*Kelsey S., supra*, 1 Cal.4th at p. 838; see *Lehr, supra*, 463 U.S. at p. 262) it offered. The resilience the trial court saw reflected in the quality of Kathryn's care of A.S. in the face of her deep personal loss clearly spoke to her long-term ability to parent the child and was an appropriate factor to consider in weighing A.S.'s best interests. The evidence supported the court's concern that Molly and appellant would fight each other for custody if the adoption did not go through, meaning significant disruption in A.S.'s life even beyond being removed from Kathryn. That the court recognized appellant as being mature for a 17 year old, and his mother as available and very able to help care for A.S. did not require it to rule in appellant's favor.

The trial court made a discretionary decision. The factual findings upon which that decision was based were supported by substantial evidence. We find no basis for concluding the court abused its discretion.

## DISPOSITION

The judgment is affirmed.

Haerle, J., and Richman, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 27, 2013, S207921.