Filed 10/22/14  P.K. v. H.M. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| P.K.,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>H.M. et al.,<br><br>    Defendants and Respondents. | G049542 (Cons. w/G049761)<br><br>(Super. Ct. No. 13P001218) |
| Adoption of N.K. | |
| P.K.,<br><br>    Appellant,<br><br>        v.<br><br>H.M. et al.,<br><br>    Respondents. | (Super. Ct. No. 13AD000217)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Ronald P. Kreber, Judge.  Affirmed.

Law Offices of Arthur J. LaCilento for Plaintiff and Appellant.

Michelle L. Jarvis for Defendant and Respondent H.M.

Ted R. Youmans and Leslie A. Barry for Defendants and Respondents Nicole and Grant K.

\* \* \*

P.K. (Father) appeals from a judgment terminating his parental rights after the birth mother H.M. (Mother) consented to adoption of the couple's newborn son, N.K., by Nicole K. and Grant K. (the Ks).[1]  (Fam. Code, § 7662.)[2]  Father challenges the sufficiency of the evidence to support the trial court's decision.  We affirm because substantial evidence supports the trial court's judgment Father was not a presumed father, and his consent to adoption was not required (§ 7611, subd. (d); *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 (*Kelsey S.*).)

This ruling was not made easily or quickly.  We recognize this case and the appeal is emotionally difficult and heartbreaking for everyone involved.  Father's love for his son is obvious, but the evidence does not meet the high standards for quasi-presumed fatherhood set by *Kelsey S.*

I

We recite the evidence in the light most favorable to the juvenile court's order, noting that the version of facts in Father's briefs portrays primarily the facts as he would like this court to see them, rather than all the facts presented and how the trial court actually found them.  (*Adoption of A.S.* (2012) 212 Cal.App.4th 188, 214-215 (*A.S.*).)

---

[1]     We identify the parties and witnesses by their initials to protect the identity of the minor child.

[2]     All further statutory references are to the Family Code.

## A. Background Facts

Father and Mother began dating in March 2012 while attending the same high school. They were both 17 years old. As will be described in more detail below, their relationship was both passionate and tumultuous. Father proposed marriage after just four months of dating Mother, and she agreed to marry him. The teens broke up and reconciled several times during the 10 months they dated before learning Mother was pregnant. Mother and Father's desire to continue dating caused serious problems and disputes with their respective families. By December 2012, they had both been kicked out of their respective homes and were nomadic, often spending the night with friends. For a time Mother moved in with her mother (maternal grandmother), who lived in Orange County. Mother commuted to the Inland Empire to continue seeing Father, meeting him in various locations.

In late December 2012, when the couple learned of Mother's pregnancy, they initially decided to keep and raise the baby together. This arrangement lasted for eight months. The couple's fighting and bickering escalated. At the end of July 2013 Mother began seeing a therapist and determined her relationship with Father was toxic and the baby should be placed for adoption. She cut off all contact with P.K approximately one month before the baby's due date. Mother chose an open adoption and selected the Ks as prospective adoptive parents.

## B. The Pre-Trial Legal Proceedings

On August 13, 2013, Father filed a petition to establish a parental relationship with his unborn child. Three days later, he filed an ex parte pendente lite request for sole physical and legal custody. Mother objected and filed a petition to determine Father's parental rights pursuant to section 7662. The court (Judge Linda Lancet Miller) consolidated the matters, stayed Father's paternity action, and denied Father's ex parte custody request.

3

Father hired a new attorney, Shannon R. Thomas, who filed a second ex parte notice. The parties, through their counsel, reached the following agreement: (1) Father would be advised when Mother went into labor; (2) Father, but not his family, could be present at the hospital; (3) Father could spend time with the newborn at the hospital; (4) Mother agreed to DNA testing; and (5) Father's ex parte request would be rescheduled.

On August 27, 2013, Father filed a request for custody and alleged the baby had Native American ancestry in the Cherokee Nation. The hearing was set for September 13, 2013. Father later revoked his claim the baby had a Native American heritage.

On Mother's due date, September 5, 2013, Father filed an ex parte request for temporary emergency orders restraining the prospective adoptive parents from taking the newborn, granting Father temporary physical custody or significant visitation, lifting the stay of the paternity action, permitting Father to be present during the birth and hold the newborn, granting Father's family access to the newborn, and requiring DNA testing. The following day, September 6, Judge Miller denied Father's ex parte request.

The minor was born on September 7, 2013. Father was notified when Mother went into labor and he was present at the hospital for the minor's birth. Father's family also came to the hospital and summoned Orange County sheriff deputies. Father's mother (hereafter paternal grandmother), threatened to file charges against the Ks for kidnapping. However, no one was arrested after the deputies confirmed Mother had an adoption plan in place. Father was permitted to briefly visit with the minor. On September 9, 2013, the minor was placed in the custody of the Ks pursuant to Mother's adoption placement agreement.

Three days later, Mother and the Ks filed an amended petition to determine Father's parental rights and the necessity of his consent to adoption pursuant to section 7662. The matter was heard by Judge Ronald P. Kreber. The court accepted the parties' stipulation to the following terms: (1) the Ks agreed Father would have contact with the minor pending trial and would make arrangements as to the location; (2) the Ks would provide pictures and updates of the baby to Father on the condition he not disseminate the information to third parties or post the pictures on any social media; (3) photographs of Father and the minor would not be used for any purpose at trial; (4) the parties agreed to not contact the media; and (5) Father dismissed his Indian Child Welfare Act claims. The court set the matter for a November 4, 2013, trial.

Before trial, Father hired a new attorney, Michael Brennan. DNA testing revealed Father was the minor's biological father.

## C. The Trial

At the trial, the court heard testimony from numerous witnesses. As will be described in more detail below, the witnesses provided overwhelming evidence Mother and Father had a passionate romance but the two were incompatible mates.

Father presented evidence to support the claim he assumed full parental responsibility from the moment he heard about the pregnancy. He testified it was always his intent to raise the child with Mother. Father testified that when he first met Mother in March 2012, he "instantly . . . fell in love with her." She accepted his marriage proposal after she graduated high school but he had one year of school left to finish. Father explained his life changed for the better when he learned Mother was pregnant, stating, "I instantly grew up and knew what my role was to be a father. Since the moment that I found out [Mother] was pregnant, I fell more and more in love with her and was willing to do anything that it took to be a father and raise a family with [Mother.]"

5

Father presented evidence he worked to support himself and Mother during her pregnancy although he was still a senior in high school. He helped pay for prenatal care, attended doctor visits, and purchased medicine for Mother. Father also purchased baby items soon after finding out about the pregnancy. Father presented evidence he lived with Mother on and off for a two-month period, and paid for their apartment. Father testified he purchased two rings for Mother and intended to marry her. He told everyone he knew about the baby and was eager to be a father. Father said he had a nursery in his house containing the necessary baby furnishing, diapers, and many other necessities.

Father also testified about the various legal avenues he pursued to gain sole custody of his son and block Mother's adoption plans when it became clear their relationship was over. Father testified he had borrowed $20,000 to pay the legal fees in this case. He admitted having a rocky relationship with Mother from the start, and that they had many fights. He explained a majority of the fights were because Mother would make him angry by talking, texting, and seeing other men.

The majority of the five-day trial was devoted to Mother's description of 29 specific altercations with Father. We will not repeat each one in great detail in this factual summary. As will become evident, the nature and outcome of each exchange were remarkably similar. Therefore, we have only described a few incidents in detail that best represent the volatile nature of the relationship.

*i. The Beginning*

During the first 10 months of their relationship, Mother and Father both described their dating relationship as "rocky." Mother recalled they broke up and reconciled four to five times. She stated they fought at least once a week. Father testified many of their disputes related to his suspicion Mother was cheating on him, and they argued about her relationships with other men.

For example, in early December 2012 Mother and Father had a heated argument at her father's (maternal grandfather's) house. Father took Mother's phone and locked himself inside his truck. Mother pleaded for the return of her phone. Father gave it back but then tried to take it away again. During the scuffle over the phone, Father reached his arms over Mother's neck while standing behind her. He left four-inch red marks on her neck while trying to try to grab the phone Mother was clutching to her chest. During this quarrel, Father called Mother various degrading and mean-spirited names. A neighbor intervened and stopped their fight. Thereafter, maternal grandfather called the police and forbade Mother from having further contact with Father

Maternal grandfather gave Mother the ultimatum of getting a restraining order against Father or move out. Mother wanted to continue her relationship with Father, and she was forced to move out of her home. Around this same time, Father was not getting along with his parents and moved away from home. He stayed with his brother or with friends ("Chandler" and "Mitch"). Mother sometimes stayed with Father at these homes. Mother moved her belongings to her mother's home (maternal grandmother). Wanting their relationship to be better, Mother and Father attended four counseling appointments to address their excessive fighting.

*ii. The Pregnancy*

When Mother learned she was pregnant at the end of December 2012, she and Father returned to the counselor, seeking help with their relationship. Although still in his senior year of high school, Father testified he found a more permanent living arrangement with his friend Chandler and began working two jobs. Father purchased Mother a more expensive engagement ring ($1,500). They both testified they planned to raise the baby together.

Father and Mother testified Mother's doctor was chosen through her parents' health insurance plan. Her prenatal care was also a covered cost. In addition to some of the doctor's appointments, Father accompanied Mother on several trips to a

7

pregnancy resource center. Mother applied for benefits with the Special Supplemental Nutrition Program for Women, Infants and Children (WIC) and for food stamps. Mother recalled Father was supportive in her efforts to obtain these benefits but only attended part of one of the required meetings. Mother admitted she did not ask Father for any money during her pregnancy. She felt uncomfortable asking him for money.

During this eight-month time period, Mother and Father arranged to meet in various places around the Inland Empire. Mother explained this was because Father was not welcome in either of her parents' homes and she did not generally get along with Father's family. At these meeting places, Mother described 14 different fights she had with Father, occurring before they decided to move in together May 1, 2013. She described eight more spats during the month they attempted to live together. After just 10 days together at their apartment, Mother stated she no longer wanted to live there, but she did not move out her belongings until May 21. After another five heated arguments in June and July, Mother started seeing a therapist because she was feeling overwhelmed, stressed, and tired. The doctor said she was losing weight when she should be gaining at the final stage of the pregnancy. Mother stated she did not want to eat when she was feeling stressed.

The nature of the couple's fights during Mother's pregnancy sounds very similar to the one described pre-pregnancy. Typically, Mother and Father would begin a dispute about Father's family or Father's jealousy and suspicion Mother was cheating on him. Mother testified Father always instigated the disputes. The argument would escalate and become a heated exchange. At some point, Mother would decide it was time to walk or drive away from Father. To prevent this, Father would take away Mother's phone and/or her car keys. He would sometimes stand in a car doorway or stand in front of Mother to block her movements so she could not get away from him. Alternatively, Father would follow Mother and grab at her arms to pull her back to him and hamper her progress. Mother said Father often called her horrible names during these altercations.

8

One particularly volatile exchange took place at the Knights Motel on January 5, 2013. One of Father's male friends ("Zak") sent Mother a Facebook message. When Father became aware of the relationship he became defensive and angry. He took Mother's phone and sent a text message to Zak telling him to stop talking to Mother. A heated argument ensued, during which Father and Mother grabbed her phone back and forth from each other. One time when Mother took her phone from Father, he called her a "bitch" and a "sketchy girlfriend." Mother claimed Father also told her to get an abortion. Father admitted calling Mother bad names but denied telling her to get an abortion.

After regaining control of her phone and keys, Mother moved across the motel bed to retrieve more belongings. Father restrained Mother's movements by holding her down on the bed. This caused Mother to cry, and she begged him to let her go. Eventually, Father let her go, but he followed her to the front door and prevented her from exiting the room by closing the room's door repeatedly each time she opened it. Mother recalled Father told her, "I just want to talk. Talk to me. You are being immature because you don't want to talk to me. Grow up. You are a child." Mother said she threatened Father that if he did not let her go she would hit him. Father grabbed her left arm as she opened the door. He pushed the door shut, and Mother hit him in the face with the keys in her right hand. She punctured his lip with the key, causing it to bleed. Father caused a bruise where he held Mother's left arm.

In February 2013 Mother moved back to live with maternal grandfather. Father resumed living with his parents. After the move, Mother described an enormous disagreement they had when Father drove to his parents' house against Mother's wishes. As he pulled up to the security gate in front of the house, Mother unlocked the door and tried to jump out while the car was moving. The couple engaged in a physical struggle as Mother tried to exit the vehicle and Father tried to keep her from leaving. Mother fell out of the car. Father then attempted to force her back inside. Mother eventually got away

9

and started walking towards a nearby shopping mall. Father followed her and yelled at her. Mother recalled Father pulled her arms back, trying to make her stop. Father said he was sorry when he later saw Mother had bruises down her right arm from the incident.

In early March, Mother was on better terms with paternal grandmother and invited her to a 4D ultrasound of the baby. Paternal grandmother brought Mother some pregnancy clothing. The peace did not last for long. Mother presented evidence of five altercations occurring in March 2013. In a church parking lot, the couple argued and Father took Mother's phone. She grabbed and ripped the back of Father's sweatshirt as he ran from her. In another battle in front of a Rite Aid store, Father prevented Mother from leaving by blocking her doorway and taking her keys and phone. A store employee intervened and called the police. The police report stated Father claimed he was upset because Mother would not let him check her phone and he believed she was lying about texting other men.

Some of the spats caused property damage. For example, on one occasion the couple spent the night together in a San Clemente hotel and quarreled about Mother's refusal to have sexual intercourse and Mother's relationship with a man named, "Aliyar." The next morning, the argument continued as they drove to Easter church services. Father called Mother names and asked her to take him home. She parked the car and the squabble became more heated. Father threw his phone onto the car's dashboard, cracking the windshield. He later paid $110 to repair it. During a different incident, Father let the air out of Mother's tires to prevent her from leaving with his keys. On a different day, Father held Mother's arms and she tripped on a curb and tore his shirt. Father threw Mother's keys out of reach, made a scene in front of her workplace, and tossed her phone into the street causing it to shatter.

When maternal grandfather again kicked Mother out of his home at the end of April 2013, Mother and Father made plans to rent an apartment together. Father stated he had saved $6,000. They agreed Father would pay the rent and utilities and buy items needed for the apartment (he testified he spent $4,000). Mother agreed to pay for food and contribute money towards the utilities. Of the many battles occurring during this timeframe, the worst and most well documented altercation occurred on May 10, 2013. Mother videotaped the dispute on her phone.

That night, Mother needed to use her laptop computer to take a final exam for an online college course. During an argument, Father took away Mother's laptop computer and car keys. Father stated he would give the items back if she paid him $500. This sum was half of what was needed to break the apartment's lease. Father yelled at Mother, "It doesn't feel good to be fucked does it?" He told Mother she needed to start treating people with respect. Father said he was "over" her and he no longer wanted to spend any money on her. Mother told Father she did not feel safe with him, and he angrily retorted she did not deserve to feel safe. Mother testified the incident made her feel scared and stressed. When she got her laptop computer back at 10 p.m., she was unable to finish her final exam by the midnight deadline.

After this incident, Mother did not immediately move out of the apartment. However, by May 21, 2013, she had removed most of her belongings. Mother would occasionally stay at the apartment with Father The fighting continued. Mother explained they fought because Father did not want her to leave. Her last stay in the apartment was sometime in June 2013.

Mother recalled she first told Father in early May she wanted to get more information about adoption. Mother stated Father "had this awful opinion about it." Mother remembered the first time she mentioned giving up the baby for adoption "he got emotional and started crying." Mother showed Father a blog of a couple seeking to adopt a child. The man was a surfer like Father, and the woman was a teacher (Mother aspired

11

to also be a teacher). Mother thought the blog would show Father it was not "this awful thing."

Mother testified about several more fights in June and July 2013. One argument started because Father became jealous after hearing a male voice in the background of Mother's phone call when she was with a friend at the mall. In another argument at a 7-Eleven parking lot, Father pounded on Mother's car windows and threw rocks at her car. Mother drove to their apartment to retrieve her bag and learned Father had taken it. Mother grabbed Father's guitar and took it with her to meet Father in a park. They had a heated exchange during which Mother recalled Father said he hated her and wished she was dead. When Mother locked her car doors, Father tugged on the handle and pulled it off. When Mother insisted he pay for the damage, he stuffed $100 down her shirt. Father denied putting money in Mother's shirt and said he was pulling the handle because Mother would not return his property.

During a heated argument in early July, Mother called the police after Father took her car keys and walked way. When Father returned approximately 20 minutes later, he gave Mother back the keys. The police report indicated Father stated he was angry about how much money he lost when they lived together. He admitted it was wrong and immature to take the keys. The report stated Father told the officers he thought Mother cheated on him and he questioned if the baby was his. At trial, Father denied telling the officers he did not think the baby was his.

Sometime in July 2013 maternal grandmother blocked Father's phone number from Mother's phone, but Mother was still able to call him and send him text messages. Mother admitted into evidence 120 pages of text messages between herself and Father from July 13 to August 13, 2013. The couple's arguments now made reference to Mother's plans for adoption. For example, on Mother's birthday in mid-July, Father and Mother argued and yelled at each other. Father told her the relationship was over. Mother recalled Father told her "he was taking my son, our son." The next

12

day, paternal grandmother telephoned Mother and left an angry voicemail message. Paternal grandmother said she was upset Mother had blocked her phone number and unhappy Mother was calling "all the shots." She reminded Mother the baby also belonged to Father and added, "But if you want a war baby girl you just got one." On July 15, 2013, Mother sent Father a text message stating, "[n]o matter what I've decided to go forward with adoption." She asked Father to be a part of the process to find their son a family.

### iii. The Break Up

Mother testified that sometime in July 2013 Father agreed to meet with adoption facilitator Sara Jensen and three different pastors about adoption. She was under the impression Father was "wish-washy" about adoption. Father testified he told Jensen he "was completely against it and that it wasn't going to happen." Father explained he hired an attorney after Jensen told him Mother could do what she wanted.

During this same time period (July 2013), Mother started going to counseling on her own. Mother testified she learned her relationship with Father was not normal and could be called toxic. Seeing the therapist significantly impacted Mother's decision to go forward with the adoption. She testified therapy made her feel confident she was making the decision for the "right reasons." Mother opined she did not regret her decision because she would not want her son to be exposed to custody battles and his parents fighting. Mother and Father ended their dating relationship when Mother was 33 weeks pregnant, at the end of July 2013. Mother cut off all contact with Father in mid-August. The baby was born September 7, 2013.

Mother opined Father started all their fights and most of the arguments were because he thought she was cheating on him. Mother denied cheating on Father. She summarized half their arguments involved physical contact, which she found offensive and caused her to feel threatened and stressed. She believed this caused the baby stress and for her to lose weight.

13

Mother testified she told Father during her pregnancy whenever she was feeling stressed during their arguments and that she did not want to fight with him. Mother recalled she told her doctor she was feeling overwhelmed, stressed, and tired. Mother explained she did not eat when she felt stressed. Her doctor stated she was losing weight and needed to gain weight.

Mother added she asked Father if he would see a counselor or therapist with her and he refused. Mother said she also asked Father to go to Lamaze and parenting classes with her. Mother recalled she told Father she could not afford to pay $100 to attend Lamaze classes but she admitted she did not directly ask him to pay. Mother claimed Father did not want to participate in those types of classes and told her they did not need classes to teach them how to be parents.[3] Mother also testified that during fights she would suggest he needed anger management classes, and Father would make a joke out of it. Mother opined Father wanted to talk more about their relationship than talk about plans for the baby.

### iv. Father's Witnesses

Sarina Schlossburg testified she overheard a fight that took place at her home between Mother and Father before the couple tried living together. Schlossburg's son, Chandler, and Father were friends, and Father was living in her home. She saw Mother "verbally attacking" Father and yelling loudly. Schlossburg opined Father did not deserve it. She saw no physical contact and the fighting stopped once she intervened.

Paternal grandmother testified Father's and Mother's relationship was "a challenge" from the start. She opined Father was extremely excited to become a father. She testified Father still had the original pregnancy test, he purchased baby clothing, and

---

[3]     During cross-examination, Father stated he agreed to go to Lamaze classes and a hospital tour but Mother never followed through to find out when the classes and tour was being held. He stated they practiced some Lamaze in their apartment.

14

he asked her to purchase clothing for Mother.  Paternal grandmother said Father told family and friends he was going to be a father and was working at two jobs to provide financial support.

Father's grandfather testified Father was excited to be a parent and was looking forward to raising his child.  Paternal great-grandfather recalled asking Father if they were considering putting the child up for adoption and Father "immediately said, 'absolutely not, it is my child.  I'm going to take care of that child.'"

Paternal grandfather testified the dating relationship was "very teenagish, like just constantly bickering like teenagers do."  He opined Father had taken steps to prepare for parenthood by purchasing clothes and acquiring furniture for the baby.  Paternal grandfather described Father as being very excited about the baby and he told everyone about it.  He added Father had borrowed $20,000 from the family to pay for his legal fees.

Father's brother stated Mother and Father lived with him briefly.  He overheard them bickering in their room.  He saw Mother storm out of the house and that Father had the "starting of a black eye."  He testified Father was committed to being a parent.

D.  *The Trial Court's Ruling*

On November 13, 2013, the court concluded Father was not a *Kelsey S.* quasi-presumed father.  The court made its statement of decision on the record, starting with the factual finding Mother and Father's relationship did not improve when they moved in together.  The court next stated it looked at facts in *Adoption of Michael H.* (1995) 10 Cal.4th 1043 (*Michael H.*).  The court summarized the *Michael H.* case and noted that court denied presumed father status despite evidence the father had substantial contact with the birth mother during her pregnancy.  The court stated, "In our case [Mother and P.K] moved in [together].  There was certainly a big issue regarding the paying of bills, $500.  In the audiotape or videotape portion that came into evidence, the

15

conversation was never about the baby, it was about a $500 bill. Anger management was not needed for him according to [Father] and Lamaze classes . . . [were] not forthcoming. [Mother] wanted to attend those classes. [¶] Also, the punching of the car the court found that [Mother] was credible in that particular instance and the court also found that [Mother] had good recollection. The court found that she was credible."

The court concluded Father, "had not positioned himself to come forward and support Mother with emotional, physical or financial support and, therefore, [his] consent [was] not needed to allow the child to go forward with the adoption." The court noted Father broke a windshield, let air out of the tires, and engaged in conduct that "did not show emotional, physical or financial support for the mother." The court stated it was necessary to not just focus on Father's conduct after the child was born. It noted that during the pregnancy there were "so many arguments," "statements," and threats to Mother. The court stated that based on *In re Ariel H.* (1999) 73 Cal.App.4th 70 (*Ariel H.*), Father must make "an effort until after the child has been born." It concluded Father failed to do so. The court dismissed Father's paternity case as moot. Father hired new counsel, Arthur LaCilento.

On November 19, 2013, the court issued a minute order "off the record," without counsel or the parties being present. The court ordered the Ks to prepare and submit a proposed statement of decision within 20 days. On November 25, 2013, the court signed and filed a judgment terminating Father's parental rights.

Two days later, Father's new attorney filed an ex parte request for emergency orders for visitation and a stay of the termination order pending Father's appeal. The court denied the ex parte request pending a hearing set for December 13, 2013. At the hearing, the court denied the requests. The court ordered counsel for the Ks to prepare a statement of decision and stated it would allow 10 days for any objections, after which it would vacate the November 25, 2013 judgment and enter a new judgment.

16

On January 2, 2014, the court signed a statement of decision that included a copy of the reporter's transcript of its ruling made at the November 2013 hearing that included the reasons the court stated on the record when ruling Father was not a presumed father. On January 6, the court vacated the prior judgment and on January 31, 2014, entered a new judgment terminating Father's parental rights.

Father filed a notice of appeal from the original November 2013 judgment and the new January 31, 2014 judgment. We consolidated the appeals.

II

A biological father's parental rights often turn on whether he attains the status of a presumed father. (*Adoption of Arthur M.* (2007) 149 Cal.App.4th 704, 718 (*Arthur M.*); *Kelsey S., supra*, 1 Cal.4th at pp. 823-825.) "Under California law, an unwed biological father has a right to withhold consent to the adoption of a child only if he meets the definition of a 'presumed father.' [Citation.]" (*A.S., supra,* 212 Cal.App.4th at p. 202.) "'If a man is the presumed father of a child, the child cannot be adopted without his consent [citation], unless the trial court finds, on statutorily specified grounds, that he is unfit. [Citation.] If, however, he is not a presumed father of a child, the child can be adopted without his consent, and his parental rights can be terminated, unless the court determines it is in the child's best interest for him to retain his parental rights. [Citation.]' [Citation.]" (*Adoption of H.R.* (2012) 205 Cal.App.4th 455, 465; *Adoption of Daniele G.* (2001) 87 Cal.App.4th 1392, 1394-1395.)

"Section 7611 sets forth the ways in which a man can attain the status of presumed father: 'A man is presumed to be the natural father of a child if he meets the conditions provided in Chapter 1 (commencing with [s]ection 7540 [(presumption arising from birth of child during marriage)]) or Chapter 3 (commencing with [s]ection 7570 [(voluntary declaration of paternity)]) . . .' or in specified other circumstances including marriage or attempted marriage to the mother under certain conditions, and having 'receive[d] the child into his home and openly [held] out the child as his natural child.'"

17

(*A.S., supra*, 212 Cal.App.4th at p. 202, fn. omitted.) The parties agree none of the statutory conditions apply in this case.

Mother and the Ks filed a petition to determine Father's parental rights pursuant to section 7662. Section 7662 generally provides that if a mother relinquishes or consents to the adoption of her child, she or the prospective adoptive parent must file a petition to terminate the parental rights of the alleged father, absent certain circumstances not present in this case. Other proceedings affecting a child (see, e.g., §§ 3000 et seq. [concerning child custody]; 3500 [child support]; 7500-7730 [addressing rights of parents, and presumptions of paternity, blood tests to determine paternity, and establishment of paternity by voluntary declaration]) are stayed pending final determination of proceedings to terminate the parental rights of the alleged father.

*A. What is a Quasi-Presumed Father?*

Father challenges the trial court's conclusion he was not a presumed father under *Kelsey S., supra*, 1 Cal.4th 816. "*Kelsey S.* established that a natural father who does not have a right to block a third party adoption as a presumed father under section 7611 may nevertheless have a constitutional right to do so. [Citations.] In *Kelsey S.,* the unwed mother sought to place the child for adoption; the natural father sought custody of the child but was prevented from achieving the status of presumed father under the provisions of what is now section 7611, subdivision (d), because he was prevented from receiving the child into his home. [Citation.] The court held that the statutory scheme 'violates the federal constitutional guarantees of equal protection and due process for unwed fathers to the extent that the statutes allow a mother unilaterally to preclude her child's biological father from becoming a presumed father and thereby allowing the state to terminate his parental rights on nothing more than a showing of the child's best interest.' [Citation.]" (*A.S., supra*, 212 Cal.App.4th at p. 208.)

18

"'[A] father who has promptly taken every available avenue to demonstrate that he is willing and able to enter into the fullest possible relationship with his under-six-month-old child should have an equally fully protected interest in preventing termination of the relationship by strangers, even if he has not as yet actually been able to form that relationship.' [Citation.]" (*Kelsey S., supra*, 1 Cal.4th at pp. 838-839.) "If an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise—his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent. Absent such a showing, the child's well-being is presumptively best served by continuation of the father's parental relationship. Similarly, when the father has come forward to grasp his parental responsibilities, his parental rights are entitled to equal protection as those of the mother." (*Id.* at p. 849, fn. omitted.) Thus functionally, *Kelsey S.* expands the definition of a presumed father to include a man who does not otherwise qualify under the statute, as long as he meets a certain standard of commitment to parenthood.

To summarize, a quasi-presumed father must present evidence he timely and sufficiently *grasped his parental responsibilities*. (*Kelsey S., supra*, 1 Cal.4th at p. 849.) The court must determine if he "demonstrate[d] a full commitment to his *parental* responsibilities—emotional, financial, and otherwise." (*Ibid.,* italics added.) "A court should consider all factors relevant to that determination. The father's conduct both *before and after* the child's birth must be considered. Once the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit. In particular, the father must demonstrate 'a willingness himself to assume full custody of the child—not merely to block adoption by others.' [Citation.] A court should also consider the father's public acknowledgment of paternity, payment of pregnancy and

19

birth expenses commensurate with his ability to do so, and prompt legal action to seek custody of the child." (*Ibid.*, fn. omitted.)

We note *Kelsey S.* focuses on the natural father's commitment to his parental responsibilities rather than his emotional support of the mother. Nothing in *Kelsey S.* suggests a father is required to love the mother, propose marriage, or be a compatible mate to qualify as a fully committed parent. *Michael H., supra,* 10 Cal.4th 1043, is not to the contrary.

In *Michael H.,* our Supreme Court held a young father, who early in the pregnancy had agreed with a plan of adoption and then did not promptly inform the mother he had changed his mind, did not attain *Kelsey S.* status by standing by and waiting to take legal action until two weeks after the child was born. (*Michael H., supra*, 10 Cal.4th at pp. 1048-1049, 1053.) The Court explained *Kelsey S.,* requires an early, unwavering, and full commitment by father concerning his nascent parental responsibility. It held father's delay in asserting parental rights between July and November compelled the finding he did not qualify under *Kelsey S.* The Court recognized father's postnatal efforts were very impressive, but his initial reaction supporting adoption doomed his chances of presumed father status. (*Michael H., supra*, 10 Cal.4th at p. 1053.)

"[T]he unwed father's constitutional interest is merely inchoate [citation] and does not ripen into a constitutional right that he can assert to prevent adoption unless he proves that he has 'promptly come[] forward and demonstrate[d] a full commitment to his parental responsibilities . . . .' [Citation.] This is so because 'the mere existence of a biological link does not merit . . . constitutional protection' [citation]; rather, the federal Constitution protects only the parental *relationship* that the unwed father has actively developed by "'com[ing] forward to participate in the rearing of his child'" [citation] and 'act[ing] as a father' [citation]." (*Michael H., supra,* 10 Cal.4th at p. 1052.)

20

Applying the *Kelsey S.* test, the Court in *Michael H.,* determined the unwed father did not show he was fully committed to his parental responsibilities early in the pregnancy because he planned with the birth mother to give the child up for adoption and also attempted suicide.  (*Michael H., supra,* 10 Cal.4th at p. 1048.)  His conduct was not representative of someone acting as a father but rather of someone looking for a way out of his parental responsibilities.  The Court found highly significant the fact father changed his mind about adoption but failed to timely tell the birth mother or the prospective adoptive parents.  (*Id.* at p. 1055.)  The Court agreed with the adoptive parents that several important public policy goals are served by requiring unwed fathers to sufficiently and timely demonstrate a full commitment to their parental responsibilities.  (*Ibid.*)  The Court mentioned three public policy considerations.

First, the Court agreed public policy is served by encouraging unwed fathers "to promptly inform the biological mother during pregnancy whether he objects or consents to the child's adoption at birth, and that he should be denied constitutional protection after birth if he concealed his views during pregnancy."  (*Michael H., supra,* 10 Cal.4th at p. 1055.)  The Court stated, "[The adoptive parents] stress that during pregnancy the mother must make many important decisions, most importantly whether to have an abortion, to prepare an adoption plan, or to keep the baby, and that she has only a relatively short time to make and implement her choice.  It is therefore important that the father give the mother prompt notice whether he plans to object or consent to adoption so that she can evaluate that and other options on an informed basis."  (*Ibid.*)

Second, the Court noted the adoptive parents "point out that the mother may well need emotional, financial, medical, or other assistance during pregnancy, particularly if she . . . is a teenager."  (*Michael H., supra,* 10 Cal.4th at p. 1055.)  The Court agreed, reasoning, "It can scarcely be disputed that prenatal care is critically important to both the mother and the child.  (See, e.g., [*In re*] *Adoption of Doe* (Fla. 1989) 543 So.2d 741, 749 ['Congress [has] found . . . [that] substantial numbers of

21

pregnant women and unborn children are placed at special risk with respect to physical and mental health by inadequate nutritional or health care']; *In Interest of Baby Girl K.* (1983) 335 N.W.2d 846, 851 ['Medical authorities have long recognized that prenatal care is important to the eventual health and well-being of an infant'].) To the extent the mother needs such critical assistance and the unwed father is able to provide it, the father, as one of the two individuals responsible for the pregnancy, should be encouraged to do so early on and should not be granted constitutional protection after birth if he has failed to timely fulfill this responsibility. Indeed, if unwed fathers are not encouraged to provide prenatal assistance when they are able to do so, the burden will often shift to the state and therefore to society generally. ([*In re*] *Adoption of Doe, supra,* 543 So.2d [at p.] 749 ['The failure of unwed fathers to provide support during pregnancy is certainly a major factor in this public problem and transfers the burden to society at large . . . .'].)" (*Michael H., supra,* 10 Cal.4th at pp. 1055-1056.)

And finally, the Court's third stated public policy was the state's interest in providing stable homes for children. The Court reasoned, "[I]f an unwed father is permitted to ignore his parental role during pregnancy but claim it after birth, it will often be very difficult to know with certainty whether he will be able to successfully contest an adoption until after the child is born. This uncertainty could well dissuade prospective adoptive parents from attempting to adopt the children of unwed mothers who, like [the birth mother], have chosen for whatever reason not to keep their child and raise it themselves. And that result would frustrate the state's clear interest in encouraging such adoptions and providing stable homes for children. (See *Kelsey S., supra*, 1 Cal.4th [at p.] 844 ['There is no dispute that "[t]he [s]tate's interest in providing for the well-being of illegitimate children is an important one"']; *Robert O. v. Russell K.* (1992) 173 A.D.2d 30 [578 N.Y.S.2d 594, 597] ['without the requirement that the unwed father manifest his interest promptly, parties to an adoption proceeding would have no assurance that an adoption was permanent. Such uncertainty would undermine the

State's recognized interest in facilitating sure and speedy adoptions and providing permanent, stable homes for adopted children . . .'].)" (*Michael H., supra,* 10 Cal.4th at p. 1056.)

The Court added, "an adopted child may suffer emotional damage if the unwed father conceals his objection to a third party adoption during pregnancy and the adoptive parents take custody at birth in reliance on the unwed father's apparent consent, but the unwed father then initiates often lengthy legal proceedings after birth in an effort to derail the adoption and remove the child from the adoptive parents' custody. If such an unwed father is allowed to prevail after perhaps years of litigation, during which time the child will likely come to see the adoptive parents as his 'true' parents, the resulting disruption in familial relationships and living arrangements can have a very damaging impact on the child's psychological growth and development." (*Michael H., supra,* 10 Cal.4th at pp. 1056-1057.) Furthermore, the Court recognized "adoptive parents suffer emotionally 'if the child is separated from them after a prolonged period.' [Citations.]" (*Id.* at pp. 1057-1058.)

Other courts have highlighted *Michael H.'s* emphasis on the need to commit to fatherhood fully and promptly. For example, the court in *Adoption of O.M.* (2008) 169 Cal.App.4th 672, determined being incarcerated during the pregnancy was no excuse to assuming parental responsibilities. (*Id.* at pp. 675-676.) In *Ariel H., supra,* 73 Cal.App.4th at p. 74, this court determined an unwed father's immaturity was also not a valid excuse. A minor father must demonstrate the same level of commitment as an adult father in order to achieve presumed father status. (*Ibid.* [15-year-old biological father continued to spend time with his friends after he learned his girlfriend was pregnant, spent his money on compact discs instead of using it to help defray pregnancy costs, and never sought to visit his child].)

23

We summarize the above case authority as follows: For an unwed father to prove he is "acting like a father" while his child is still in utero, he must immediately and unequivocally express interest in raising the child after the birth, with or without the birth mother's involvement. Although it is difficult for a father to physically care for or nurture his child before its actual birth because it is housed in the mother's womb, the *Michael H.* case recognized a father's "parental responsibilities" during this time *may extend* to providing care and support for the birth mother's physical health. "[P]renatal care is critically important to both the mother and the child. [Citations.]" (*Michael H., supra,* 10 Cal.4th at pp. 1055-1056.) Certainly by providing the birth mother with any needed assistance in obtaining good nutrition and healthcare the biological father will clearly demonstrate he has a substantial interest in his child's welfare.

*B. Analysis*

We review the trial court's decision under the substantial evidence test, viewing "all factual matters most favorably to the prevailing party and in support of the judgment, indulging all reasonable inferences and resolving all conflicts accordingly." (*Arthur M., supra,* 149 Cal.App.4th at p. 717.) "We do not evaluate the credibility of witnesses, attempt to resolve conflicts in the evidence or determine the weight of the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the court's order and affirm the order even if there is other evidence supporting a contrary finding. [Citations.]" (*In re R.V.* (2012) 208 Cal.App.4th 837, 843.)

Father argues the following evidence establishes he promptly came forward and demonstrated a full commitment to his parental responsibilities. First, he persuaded Mother to keep the baby, paid for doctor copayments for prenatal care, provided Mother medicine for nausea, and attended every prenatal medical visit Mother would permit him to attend. Second, he lived with Mother for a two-month period, paying for the apartment, furnishing, utilities, etc. Third, Father intended to marry Mother and

24

purchased two engagement rings. He also purchased clothes and necessities for the baby. And, fourth, Father spent over $20,000 in legal fees and started fighting for custody prior to his child's birth. He worked two jobs and was saving money. He told everyone he was excited to be a father.

Father fails to acknowledge or make reference to the voluminous evidence presented by Mother regarding his conduct during their many altercations during the pregnancy. More importantly, Father provides no reasoned analysis regarding whether his misconduct was relevant. Essentially Father would like us to disregard the evidence presented by Mother and instead only focus on his positive efforts to be a good father and preparations for fatherhood. As stated above, it is not our job to reweigh the evidence or conduct a second trial. "In claiming that the evidence is insufficient to support the trial court's findings, an appellant must '"demonstrate that there is no substantial evidence to support the challenged findings." . . . [Citations.]' [Citation.] 'A recitation of only [appellant's] evidence is not the "demonstration" contemplated under the above rule. [Citation.] Accordingly, if, as [appellant] here contend[s], "some particular issue of fact is not sustained, [appellant is] required to set forth in [his] brief *all* the material evidence on the point and *not merely [his] own evidence*. Unless this is done the error is deemed to be [forfeited]." (Italics added.) [Citations.]' [Citations.]" (*In re S.C.* (2006) 138 Cal.App.4th 396, 414-415.)

In any event, applying the substantial evidence test, we find no reason to disturb the court's ruling. Although the record suggests Father's motivation and intention was to preserve his relationship with Mother and create a unified family unit for his son, his actions did not benefit his unborn child's welfare. Mother repeatedly testified the constant bickering and altercations during her relationship with Father caused her to suffer a great deal of stress. Towards the end of her pregnancy, her physician said she was losing rather than gaining weight. The stress was causing Mother to stop eating properly. Mother testified she told Father the fighting was making her feel stressed and

25

overwhelmed. Yet, it appears the fighting got worse and more heated as the pregnancy progressed. It is undisputed Father became more physically aggressive with Mother as his desperation to salvage their relationship and control all aspects of her social life intensified. It appears Father was so intently focused on his relationship with Mother, and its many ups and downs, that he lost sight of his parental responsibilities to his child's health and welfare in utero. Stress during pregnancy can lead to premature birth, a low birth weight baby, and serious medical problems.

We recognize that as a senior in high school, Father did a commendable job trying to assume many parental responsibilities (as highlighted in his briefing).[4] Father's and Mother's immaturity may be blamed as the force behind their constant bickering and Father's extreme jealousy over Mother's social life that included other men. We recognize it must be very difficult for a teenage boy to fully understand what it means to demonstrate a parental commitment to an unborn child. However, as explained above, a minor father must demonstrate the same level of commitment as an adult father in order to achieve presumed father status. (*Ariel H., supra,* 73 Cal.App.4th at p. 74.) Thus, regardless of his age and the reasons Father gave for squabbling with Mother, it cannot be overlooked that Father knowingly and repeatedly ignored his parental responsibilities to the health and welfare of his unborn child by persisting in unhealthy altercations with

---

[4] We are aware many of the facts stated in Father's brief were contradicted by Mother's testimony. For example, Father stated he paid insurance copays, but Mother explained her insurance did not require copays. We need not take apart each fact contained in Father's brief because, as described, we find other evidence amply supports the trial court's ruling.

26

Mother during the pregnancy. Father directly contributed to creating an extremely stressful environment for Mother and the baby, which was completely unnecessary.[5]

Simply stated, an adult father's *parental responsibilities* during pregnancy extend to providing care and support for the birth mother's physical and emotional health to the extent it affects the health and welfare of the child she is carrying. We are not suggesting Father was required to dote on Mother, massage her feet, or send her flowers. He did not have to marry her or love her. However, he must demonstrate a commitment to the prenatal care and health of his unborn child and not engage in behavior that jeopardized the child's well-being.

C. *Respondents' Arguments Lack Merit*

We have determined there was substantial evidence to support the trial court's ruling but wish to clarify we do not agree with many of the arguments raised by respondents. We begin with the Ks' and Mother's contention that evidence Father did not emotionally *support Mother* can alone be used to uphold the judgment. They assert the *Michael H.* case held, "[I]n addition to the biological father's public acknowledgment of paternity . . . and his actions to seek custody of the child, one of the *most important factors bearing* on whether or not he qualifies as a quasi-presumed father is whether he provided emotional support for the mother during her pregnancy." (Italics added.) This is not a correct statement of the *Michael H.* case or the current status of the law.

---

[5] We recognize one of Father's arguments on appeal is that the trial court improperly analogized this case to the facts underlying the *Michael H.* and *Ariel H.* cases. We agree there are not many factual similarities between the cases. Nonetheless, we conclude the court's ruling shows it understood the factual distinctions and correctly applied the underlying legal concepts. The court cited cases highlighting a *Kelsey S.* quasi-presumed father must quickly grasp his *adult* parental responsibilities *before* the child's birth. As stated above, Father's immature misconduct in his dealings with Mother, and the stressful environment it created *before* the birth did not demonstrate a strong parental commitment to his unborn child.

27

Both *Kelsey S.* and *Michael H.* held an unwed father's actions must be assessed in light of the realities of the relationship with the birth mother. In *Michael H.,* the Court restated the test first articulated in *Kelsey S.*: "'If an unwed father *promptly* comes forward and demonstrates a full commitment to his parental responsibilities— emotional, financial, and otherwise—his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent.'" (*Michael H., supra,* 10 Cal.4th at p. 1055, citing *Kelsey S., supra,* 1 Cal.4th at p. 849.) Our Supreme Court determined the trial court misapplied the *Kelsey S.* decision by failing to consider a father's conduct *before* the child's birth, and improperly focused on the father's level of commitment after the birth. Within this context, the Court in *Michael H.* discussed several factors relevant to the determination of whether there was a *prompt commitment to parental responsibilities* during the pregnancy. The factors all related to the father's responsibilities *to the child*. There was no discussion that parental responsibilities necessarily include a full commitment to the birth mother's emotional well-being. The proper focus is on father's level of willingness to shoulder the responsibilities for his child.

Thus, it appears the Ks and Mother have misconstrued the Supreme Court's public policy discussion of why a prompt commitment to parenthood is necessary. The Court noted a teenage mother "may well need emotional, financial, medical, or other assistance during pregnancy . . . ." (*Michael H., supra,* 10 Cal.4th at p. 1055.) This statement was made in the context of the well documented importance of prenatal care to the health of an unborn child and recognition that without the father's assistance, the burden to support shifts to the state and becomes a burden to society. The Court determined public policy would be served by "encouraging" unwed fathers to provide prenatal assistance early on, if he "is able to provide it." (*Id.* at pp. 1055-1056.) In addition, the Supreme Court's discussion of the father's possible responsibilities to the birth mother applies to cases where there is a *need* for assistance with prenatal care. A

28

teenage mother "may well need" the emotional, financial, and medical assistance to receive adequate prenatal care and she "may well" not. (*Ibid.*) Moreover, the Supreme Court did not suggest an unwed teenage father must provide emotional support *unrelated* to prenatal care or the welfare of his child. It would be excessive and wrong to require an unwed father to exhibit false affection or love towards a teenage mother under the theory he will not otherwise be awarded constitutional protection.

We also notice the Ks and Mother seek to portray Father as a villain for aggressively seeking and pursuing various legal remedies after Mother cut off contact, signed an adoption placement agreement without his consent, left the birth certificate blank, and would not sign a voluntary declaration of paternity. We find their argument is unfair. If Father had not hired an attorney, and if he failed to file a paternity action, and if he did not seek sole custody of the child, we suspect the Ks and Mother would be arguing Father failed to demonstrate a willingness to assume full custody of the child once the relationship ended. As discussed above, the body of case authority on this issue clearly provides a father must demonstrate he has "'promptly taken every available avenue to demonstrate that he is willing and able to enter into the fullest possible relationship'" with his child. (*Kelsey S., supra*, 1 Cal.4th at pp. 838-839.) And the court in *Kelsey S.* specified that one important factor for trial courts to consider is whether the unwed father took "prompt legal action to seek custody of the child." (*Id.,* fn. omitted.) If Father had sat back and done nothing during the last month of Mother's pregnancy he certainly would have lost any chance he had of achieving the status of a quasi-presumed father. Father cannot be faulted for pursuing all legal avenues after it became clear Mother would no longer have contact with him and was placing the child for adoption against his wishes.

We also find troubling the Ks' argument Father was not entitled to quasi-presumed father status because his legal maneuvering was designed to merely block the adoption. The Ks assert Father admitted during trial that his sole purpose in

29

filing the paternity action was to "block the adoption from going through."  Father's statement must be read in context.  Father stated he hired an attorney soon after learning Mother was going to place the child for adoption without his consent.  And the record shows Father's lawyers sought court orders giving Father sole physical and legal custody.  He wanted to be present at the birth, to hold the minor, to have visitation, and be given photographs and updates.  This is all appropriate conduct of a father who desires full custody, not merely to block adoption by others.

### III

Father asserts the trial court erred in finding termination of his parental rights was in the minor's best interests.  We conclude Father waived any challenge to the court's best interest finding by failing to raise the issue below and by stipulating to the finding that adoption was in the minor's best interests.

"Where a natural father does not have presumed father status under section 7611 or a constitutional right to block an adoption under *Kelsey S.*, "'the child can be adopted without his consent, and his parental rights can be terminated, unless the court determines it is in the child's best interest for him to retain his parental rights. [Citation.]'"  [Citations.]" (*A.S., supra*, 212 Cal.App.4th at p. 215.)  Section 7664, subdivision (b), provides that if the natural father claims parental rights, "the court shall determine if he is the biological father.  The court shall then determine if it is in the best interest of the child that the biological father retain his parental rights, or that an adoption of the child be allowed to proceed.  The court, in making that determination, may consider all relevant evidence, including the efforts made by the biological father to obtain custody, the age and prior placement of the child, and the effects of a change of placement on the child."  "If the court finds that it is in the best interest of the child that the biological father should be allowed to retain his parental rights, the court shall order that his consent is necessary for an adoption.  If the court finds that the man claiming parental rights is not the biological father, or that if he is the biological father it is in the

30

child's best interest that an adoption be allowed to proceed, the court shall order that the consent of that man is not required for an adoption. This finding terminates all parental rights and responsibilities with respect to the child." (§ 7664, subd. (c).)

On appeal, Father claims it was contrary to the minor's best interests to allow the adoption and he cites to all the same facts he articulated that supported a *Kelsey S.* quasi-presumed father status. As correctly noted by the Ks, the record shows Father stipulated to the issue of whether his consent was required for the adoption to proceed. The court's minute order prepared the last day of trial contains evidence of the stipulation. It reflects that after the court determined Father was not the presumed father, it scheduled a hearing for the following day to discuss whether Father had standing as a father to object to the adoption proceedings. The minute order shows the matter was trailed for approximately 10 minutes to permit counsel to meet and confer. The order states that in a "closed court" with only counsel present, counsel for both parties presented a stipulation. The court's next entry in its minute order states, "Pursuant to the stipulation of counsels, [c]ourt vacates its previous order for parties and counsel to return tomorrow. [¶] The court finds [Father's] consent is not required for the adoption case to proceed in San Diego County." The court also ordered Father's parental rights be terminated.

Although not clearly stated, it can reasonably be inferred the stipulation addressed the issue of the minor's best interests and Father's standing to consent because the court vacated its order scheduling a hearing to address those very same issues. The court's order finding Father's consent was not required must come *after* consideration and resolution of the minor's best interest. (§ 7664, subd. (c).) In his reply brief, Father does not dispute the nature and scope of the stipulation, nor does he refer to any place in the record where he objected to the court's best interest ruling. "Counsel for the [Ks] correctly points out that a party may not appeal from an order or judgment entered pursuant to stipulation. [Citation.]" (*In re Jennifer V.* (1988) 197 Cal.App.3d 1206,

31

1209.)  In addition, Father's failure to raise the issue below forfeits appellate review.  (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 222 ["A party may not assert theories on appeal which were not raised in the trial court"].)

IV

The judgment is affirmed.[6]  In the interests of justice, each party shall bear their own costs on appeal.

O'LEARY, P. J.

WE CONCUR:

BEDSWORTH, J.

FYBEL, J.

---

[6]        We are aware of rule 8.416(c) of the California Rules of Court, which shortens the time for record preparation and briefing in appeals freeing a child from parental custody "to permit determination of the appeal within 250 days after the notice of appeal is filed . . . ."  In this case, the appointment of counsel for respondent H.M., and the consolidation of the two appeals, unavoidably delayed record preparation and briefing so that it was filed beyond the 250 day target.