Filed 9/12/16  M.J. v. Superior Court CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

<table>
<tr><td>

M.J.,

     Petitioner,

v.

THE SUPERIOR COURT OF CONTRA COSTA COUNTY,

     Respondent;

CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU,

     Real Party in Interest.

</td><td>

A148656

(Contra Costa County Super. Ct. No. J15-01144)

</td></tr>
</table>

M.J. petitions for extraordinary relief under California Rules of Court, rule 8.452, asking us to set aside the juvenile court's order setting a hearing pursuant to Welfare and Institutions Code[1] section 366.26.  He contends the juvenile court erred in denying him presumed father status, making him ineligible for family reunification services.  We deny the petition on the merits.

## I.  BACKGROUND

Z.J. (Minor) was born more than three weeks premature in late August 2015, had a low birth weight, and suffered from respiratory problems.[2]  His mother, M.C. (Mother), had tested positive for methamphetamine three times during her pregnancy, although both

---

[1] All undesignated statutory references are to the Welfare and Institutions Code.

[2] All events described below occurred between August 2015 and June 2016.

1

she and Minor tested negative at his birth.[3]  The day after Minor was born, Mother told a social worker she was living in a substance abuse treatment center, Love A Child Ministries, in Pittsburg, California.  Mother said she had many supplies ready for the baby and would get the remaining items from a thrift shop down the street from her home.

Mother and Minor left the hospital on September 3, and a social worker visited them at the substance abuse treatment center on September 11.  The living environment was clean, organized, and equipped with all the necessary baby supplies.  At some point after this visit, Mother left the substance abuse treatment center with Minor, providing no new address to the social worker.  Their location was unknown for more than a month.

On October 14, the social worker learned Mother and Minor were living in a hotel. Visiting them there, the social worker observed that Minor appeared healthy and the room contained baby formula, diapers, wipes, and clean clothes.  Mother said she had moved out of the treatment center because there were rodents and roaches.  She said she and Minor were homeless and using vouchers to stay in hotels.

M.J., also present during that discussion, appeared "alert" and "helpful."  Mother said M.J. was helping her take care of his child and that they had stayed at a different hotel together the week before.  She said she and M.J. were looking for childcare so that they could seek employment.  Mother planned to remain at the current hotel another week and then move in with a family member, "Uncle Butch," who lived in Richmond.

The social worker also interviewed the manager at the hotel where the three had stayed the week before.  The hotel manager said M.J. had a short temper, had destroyed the sink in his room, and tried to blame the damage on the neighbors.  But the manager said both Mother and M.J. appeared to take good care of Minor.

The social worker returned with Mother's probation officer on October 16 to talk with Mother and M.J. about Mother's ability to care for Minor, and Mother admitted she had not been taking the medication for her bipolar disorder regularly.  Three days later,

---

[3] Mother is not a party to this writ proceeding.

2

the social worker received reports that Mother had missed Minor's health checkup and some lactation appointments. The next day, the probation officer reported Mother had checked out of the hotel and missed an appointment for a drug test.

On October 26, Mother left her probation officer a message that she and Minor had moved to San Francisco. The next day, a homeless outreach team in San Francisco reported seeing Mother wandering, apparently intoxicated, with a baby possibly naked and wrapped in a blanket, accompanied by a man described as the step-father. The homeless outreach team attempted to talk to the couple and notified local police. The couple and the baby left, however, when the police arrived.

On October 28, Mother and Minor entered a homeless shelter, and Mother was interviewed by a social worker, representatives of various local agencies, and a police officer. When the social worker advised Mother she had missed Minor's last four medical appointments, Mother appeared confused. She said her plan to move in with her uncle had fallen through. Although she did not know M.J.'s whereabouts, she said she planned to accompany him to Redding to live with one of his family friends. Contra Costa County Children and Family Services (Children and Family Services) detained Minor the same day, placing him with a foster family, and gave Mother written notice of her rights and information about the detention hearing.

On October 30, Children and Family Services filed a petition under section 300, asking the court to declare Minor a dependent of the juvenile court. The petition alleged that Minor was a medically fragile child and that Mother was homeless, had a serious chronic poly-substance abuse problem, and had a mental health condition for which she lacked consistent treatment and medication. It alleged Mother had failed to provide Minor consistent medical care and treatment, missing or canceling multiple medical appointments, which placed Minor at substantial risk of physical harm. The petition listed M.J. as the alleged father.

On November 2, Children and Family Services filed a detention report. The report said Mother had given M.J.'s name as one of three men who could be Minor's father. The social worker expressed concern in the report about Mother's failure to consistently

3

take medication for her mental health condition or to secure stable shelter, and about Minor's need for frequent medical follow up appointments. He credited Mother and M.J. for being resilient in attempting to care for Minor despite their limited resources, however, noting they immediately sought professional medical attention on one occasion in September when Minor was in distress. The social worker recognized that M.J. had assumed the position of caring for Mother and assisting with Minor's care. He reported M.J. had expressed unwavering affection for Mother, telling the social worker he was dedicated to continuing as Mother's partner and Minor's father.

Neither Mother nor M.J. appeared for the detention hearing on November 2, and the juvenile court ordered Minor detained. In December, M.J. submitted a form JV-505, "Statement Regarding Parentage." In it, he said believed he was Minor's father, requested court appointment of counsel, and sought a judgment of parentage. M.J. wrote that Minor had lived with him from October 4 to October 28, and that he co-parented Minor during this period, bathing, feeding, and soothing him, changing his diapers, and walking, singing, and reading books with him. Although he was unemployed, M.J. wrote, he spent long hours collecting cans, had purchased baby supplies and motel rooms for Minor, and also had given Mother money to buy things for Minor. M.J. said he had applied to public and private entities for financial assistance to support Minor and had told many people Minor was his child. He said he had taken Minor to see his own mother and that his "legal wife" had visited Minor in the hospital when Minor was born. M.J. wrote that he loved Minor, understood the importance of family, having himself grown up as a ward of the courts, and looked forward to fulfilling his responsibility as Minor's father. As evidence of his commitment, M.J. reported, on December 1, he had enrolled in a six-month drug treatment program, and was taking parenting classes.

By December 24, however, M.J. was in custody in the San Francisco County Jail. On January 4, 2016, he appeared by telephone while in custody for the jurisdictional hearing, and the juvenile court directed the Legal Aid Society to contact him. At the end of the month, however, the Legal Aid Society reported it had been unable to contact M.J., who was not returning calls.

M.J. did not appear at the contested jurisdictional hearing on February 4. In that hearing, the court sustained the Children and Family Services petition, finding Minor to be a dependent of the juvenile court under section 300, subdivision (b), and scheduled a dispositional hearing, ordering notice to be served on M.J.

The disposition hearing began on March 7. A contested hearing was scheduled for April 11 and then continued until May 23. Meanwhile, on April 14, the juvenile court appointed counsel to represent M.J. and ordered genetic testing with his counsel's agreement.

On May 23, M.J. appeared by telephone, represented by counsel, while still in custody and requested presumed father status. M.J.'s attorney told the court that M.J. and Mother were a couple, although they were not married, and that M.J. had supported Mother during her pregnancy, been at her side shortly after Minor was born, and believed he was Minor's father. M.J. told the court he was enrolled in a residential treatment program while in custody. The court denied the request, finding insufficient evidence to support granting M.J. presumed father status. It continued the hearing for a determination of whether he was the biological father once genetic testing results were received, however, leaving open the possibly he might be awarded reunification services.

The dispositional hearing concluded on June 15. M.J. appeared by telephone, represented by counsel, and was still in custody. The disposition report listed M.J. as the alleged father, but observed he was not named on Minor's birth certificate and that Mother had said two other men also could be the father. The genetic testing results, filed with the court the same day, confirmed M.J. was not Minor's biological father. Although M.J. again requested presumed father status, the juvenile court declined to revisit its earlier ruling, reiterating that there was insufficient evidence to support granting him that status.

Having found that M.J. was not the presumed or biological father, the juvenile court ruled he had no rights or interests in this matter, signifying that he did not qualify for reunification services. The juvenile court then adjudged Minor to be a dependent child, found that placement with Mother would create a substantial risk to Minor's well-

5

being, and found by clear and convincing evidence that protection of Minor's welfare required removal from Mother's physical custody because there was substantial danger to his physical health if he were returned to her custody, and there were no other reasonable means of protecting him. The juvenile court set a selection and implementation hearing pursuant to section 366.26 for October 13, 2016.

## II.  DISCUSSION

### A.  Applicable Law and Standard of Review

In dependency proceedings, "fathers" are divided into several different categories. " 'The extent to which a father may participate in dependency proceedings and his rights in those proceedings are dependent on his paternal status.' " (*In re Christopher M.* (2003) 113 Cal.App.4th 155, 159.)  In this case, M.J. initially was described as the alleged father, and he asked to be declared the presumed father.

"An alleged father may be the father of a dependent child.  However, he has not yet been established to be the child's natural or presumed father." (*In re E.O.* (2010) 182 Cal.App.4th 722, 726.)  He " 'does not have a current interest' " in the child, therefore, and "has limited due process and statutory rights." (*In re Paul H.* (2003) 111 Cal.App.4th 753, 760.)  Generally, an alleged father has a right " 'to appear and assert a position and attempt to change his paternity status . . . .' " (*In re J.O.* (2009) 178 Cal.App.4th 139, 147, quoting *In re Kobe A.* (2007) 146 Cal.App.4th 1113, 1120.)  He is not entitled to reunification services. (*In re Paul H., supra*, at p. 760.)  " ' "Presumed" fathers are accorded far greater parental rights.' " (*In re T.G.* (2013) 215 Cal.App.4th 1, 4–5.)  The "status entitles the father to appointed counsel, custody (absent a finding of detriment), and a reunification plan." (*In re T.R.* (2005) 132 Cal.App.4th 1202, 1209, citing §§ 317, subd. (a), 361.2, subd. (a), 361.5, subd. (a).)

Presumed father status is governed by Family Code section 7611, "which sets out several rebuttable presumptions under which a man may qualify for this status, generally by marrying or attempting to marry the child's mother or by publicly acknowledging paternity and receiving the child into his home." (*In re J.L.* (2008) 159 Cal.App.4th

6

1010, 1018.)[4] M.J. attempted to qualify as a presumed father under the last of these options, which is described in subdivision (d) of Family Code section 7611. Under that provision, a man is presumed to be the natural father of a child if he "receives the child into his . . . home and openly holds out the child as his . . . natural child." (Fam. Code, § 7611, subd. (d).) A man who claims entitlement to this status "has the burden of establishing by a preponderance of the evidence the facts supporting his entitlement." (*In re J.O., supra*, 178 Cal.App.4th at p. 147.) It is for the trier of fact to determine whether those facts are established by a preponderance of the evidence. (*In re Spencer W.* (1996) 48 Cal.App.4th 1647, 1652–1653.)

We review for substantial evidence the juvenile court's rejection of M.J.'s claim to presumed father status. (*In re Alexander P., supra*, 1 Cal.App.5th at p. 1279.) Under this standard, we must determine whether the evidence would permit the trier of fact to conclude that one of the foundational facts necessary for presumed father status was not present. (*In re Spencer W., supra*, 48 Cal.App.4th at p. 1653.) In doing so, " '[w]e view the evidence in the light most favorable to the ruling, giving it the benefit of every reasonable inference and resolving all conflicts in support of the judgment.' " (*In re Alexander, supra*, 1 Cal.App.5th at p. 1279, quoting *R.M. v. T.A.* (2015) 233 Cal.App.4th 760, 780 (*R.M.*).)

## B. Analysis

The relevant question before us is whether M.J. adequately demonstrated under Family Code section 7611, subdivision (d), that he deserved presumed father status because he received Minor into his home and openly held Minor out as his natural child. We conclude the trial court reasonably found that M.J. failed to carry his burden of establishing presumed father status.

---

[4] See *In re Alexander P.* (2016) 1 Cal.App.5th 1262, 1273, fn. 5 (acknowledging that Family Code section 7611 was amended in 2013 "to refer to a presumed 'parent' rather than 'father,' recognizing that the second parent of a child may be female as well as male"), quoting Stats. 2013, ch. 510, § 3.

" 'In determining whether a man has "receiv[ed a] child into his home and openly h[eld] out the child" as his own [citation], courts have looked to such factors as whether the man actively helped the mother in prenatal care; whether he paid pregnancy and birth expenses commensurate with his ability to do so; whether he promptly took legal action to obtain custody of the child; whether he sought to have his name placed on the birth certificate; whether and how long he cared for the child; whether there is unequivocal evidence that he had acknowledged the child; the number of people to whom he had acknowledged the child; whether he provided for the child after it no longer resided with him; whether, if the child needed public benefits, he had pursued completion of the requisite paperwork; and whether his care was merely incidental.' " (*In re J.H.* (2011) 198 Cal.App.4th 635, 646, quoting *In re T.R., supra*, 132 Cal.App.4th at p. 1211.)

Evaluation of these factors may assist a court in determining whether a person has an "established relationship with and demonstrated commitment to the child." (*In re Alexander P., supra*, 1 Cal.App.5th at p. 1273.) To qualify as a presumed father under Family Code section 7611, subdivision (d), "a person must have a 'fully developed parental relationship' with the child. ([*R.M., supra*, 233 Cal.App.4th at p. 776], italics omitted.) It is not enough to demonstrate 'only a caretaking role and/or romantic involvement with a child's parent.' (*Id.* at p. 777.) Rather, the presumed parent must demonstrate ' "a full commitment to his [or her] parental responsibilities—emotional, financial, and otherwise." ' ([*In re Jerry P.* (2002)] 95 Cal.App.4th [793,] 801–802, fn. omitted.)" (*In re Alexander P., supra*, 1 Cal.App.5th at p. 1273.)

Although there is evidence that M.J. cared for Minor in October, the evidence does not establish that he had a fully developed parental relationship with the child, or that he made a full and consistent commitment to parental responsibilities. M.J. claimed he supported Mother financially through her pregnancy, but he offered no details regarding the source or nature of the alleged financial support and the record contains no evidence on this point. M.J. does not claim he lived with Mother, accompanied her to medical

8

appointments during her pregnancy,[5] or sought to have his name placed on Minor's birth certificate, although he advises that he and his "legal wife" visited the hospital following the birth. (See, e.g., *Adoption of A.S.* (2012) 212 Cal.App.4th 188, 209 [in evaluating allegations of a presumed father status, the " 'father's conduct both *before and after* the child's birth must be considered' "]; compare with *In re Jerry P., supra*, 95 Cal.App.4th at p. 806 [alleged father supplied the mother with vitamin supplements and bus fare for doctor visits during her pregnancy, helped with prenatal care, paid for her medications, and visited and held the child daily in the hospital for the first week following the birth].)

With the exception of the hospital visit after Minor was born in late August, and one instance in September when M.J. and Mother together took Minor to the doctor, there is no evidence M.J. had or sought contact with Minor in the first weeks of his life, before he and Mother took up shared residence in a hotel room in October. M.J. claims he sought work and financial assistance that month to support Minor, but there is no evidence he completed any benefit applications or secured financial assistance. M.J. said he told many people Minor was his son and took Minor to see his own mother. But he did not accompany Mother and Minor to the shelter at the end of October and, on arriving at the shelter, Mother said she did not know his whereabouts. There also is no evidence M.J. ever attempted to visit Minor, or asked about his well-being in the months after Minor was placed in foster care. (Compare with *In re Jerry P., supra*, 95 Cal.App.4th at pp. 798–799, 806 [after child was removed from the hospital without the alleged father's knowledge, he spent months looking for the child, asked to visit on learning the child was in foster care, immediately contacted the foster parents on learning their name and telephone number, consistently visited once permission was granted, bringing diapers, food, and toys, never missing a visit, and called the foster mother twice a week to check the child's well-being].)

---

[5] The evidence reflects that Mother went to only two or three prenatal visits, tested positive for methamphetamine on three dates, and admitted using drugs during her pregnancy.

M.J. did submit a formal statement claiming he was Minor's parent. According to that statement, M.J. took good care of Minor in October while they lived together and felt an emotional bond with him. In December, M.J. apparently enrolled in a drug treatment program, and began attending parenting classes, and he has advised that he is continuing both efforts while incarcerated. Also, while incarcerated, M.J. has attended several court hearings in this matter by telephone, and requested presumed father status.

Courts have recognized that "a man attempting to satisfy the 'holding out' requirement for presumed father status 'may [be] restricted . . . as a practical matter, in his ability to act fully as a father.' " (*In re Jerry P., supra*, 95 Cal.App.4th at p. 806, quoting *Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 850 (*Kelsey S.*).) At least one court also has observed that, to satisfy the "receiving into one's home" requirement, there is no obligation to prove one "rents or owns a residence." (*In re Alexander P., supra*, 1 Cal.App.5th at p. 1281 ["One's 'home' is the place where one resides"]; see, e.g., *In re Jerry P., supra*, 95 Cal.App.4th at pp. 807, 799 [ "there will be cases where the father cannot physically take the child into his home," for example, because the child has been detained or must remain in the hospital, or because the facility where the father lives does not accept children as residents].) In this case, M.J. was practically restricted in his ability to act as a father because he apparently was unemployed and homeless at the end of October when Minor was placed in foster care, and now is incarcerated.

Where such practical restrictions exist, the trial court must consider " 'whether petitioner has done all that he could reasonably do *under the circumstances.*' " (*In re Jerry P., supra*, 95 Cal.App.4th at p. 806, quoting *Kelsey S., supra*, 1 Cal.4th at p. 850.) "This means '[o]nce the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit.' " (*In re Jerry P.,supra*, at p. 806, quoting *Kelsey S.,supra*, at p. 850.) He must "*treat* the child as though the child was his . . . own by developing a parental relationship," and taking on parental responsibilities. (*In re Alexander P., supra*, 1 Cal.App.5th at p. 1280.) "What ultimately matters to presumed

parent status is a person's commitment to the child and the responsibilities of parenthood." (*Id.* at p. 1281.)

In this case, although M.J. demonstrated a commitment to Minor for three and a half weeks in October,[6] there is no evidence he assumed parental responsibilities during Mother's pregnancy, or in the weeks immediately after Minor was born. Since October, apart from his participation in this action, there is no evidence M.J. took practical steps to hold Minor out as his son, or to continue developing a parental relationship with him. There is no evidence that Minor, who would now be one year old, has a current emotional bond with M.J. or even knows who M.J. is. (See *In re Jerry P., supra*, 95 Cal.App.4th at p. 806 [observing that the alleged father had "developed a bond with the child, who refers to him as 'Daddy' "].) M.J. also appears to have been homeless or incarcerated since last October and, therefore, unable to welcome Minor into his home or reside with him. The evidence simply does not establish that M.J. has a fully developed parental relationship with Minor, or that M.J. has displayed a full and continuous commitment to his emotional and financial parental responsibilities since learning of Mother's pregnancy. (See, e.g., *In re Alexander P., supra*, 1 Cal.App.5th at pp. 1280–1281 ["A person who is not a biological parent does not satisfy the 'openly holds out' requirement merely because he or she is willing to claim parentage"].)

Confronted with similar facts, courts have denied presumed father status. In *Glen C. v. Superior Court* (2000) 78 Cal.App.4th 570, for example, the petitioner claimed a paternal interest in three children, maintained contact with them at least during his most recent incarceration, and apparently worked diligently in a parenting skills program he

---

[6] Children and Family Services asserts that Mother and Minor remained at the Love A Child Ministries substance abuse treatment center until October 14, thereby indicating that M.J., Mother, and Minor lived together for only two weeks, from October 14 to 28 (rather than from October 4 to 28, as M.J. contends). But, as acknowledged elsewhere in its own brief, Mother abruptly left the treatment center with Minor at some point after the social worker visited on September 11. When next interviewed in a hotel on October 14, Mother said she, M.J., and Minor had been together at another hotel the previous week.

attended. (*Id.* at p. 586.) The Court of Appeal concluded he did not qualify as a presumed father, however, because there was no evidence he ever lived with the children, he had no abode of his own in the brief period he was free from custody after the older two were born, did not play any role in their early lives, was not able to remain at liberty for more than a short period, and offered no relative who could care for them while he was incarcerated. (*Id.* at pp. 585–586.) Although M.J., in contrast, did briefly live with Minor, the facts are similar here in that he was not able to remain at liberty for long after Minor was born, has played little role in Minor's life with the exception of that brief period, and has offered no relative who could care for Minor while he is incarcerated.

*In re Sarah* (1992) 8 Cal.App.4th 964 is also instructive. The biological father in that case moved in with the child and her mother, helping to care for the child, because he needed a place to stay. (*Id.* at p. 973.) He remained with mother and child for just a few months before being arrested, only contributing once to living expenses, did not seek to have himself listed on the child's birth certificate as her father, and did not complete paperwork with the Navy to have the child named as his dependent or insurance beneficiary. (*Id.* at pp. 969, 972–973.)

In comparison, in the current case, M.J. lived an even shorter time (less than one month) with Mother and Minor, and there is conflicting evidence about who paid for the motel rooms they shared, as Mother said she was using vouchers, and M.J. said he gathered money from collecting cans. There is no evidence M.J. sought to have himself listed on Minor's birth certificate as the father nor evidence that he completed any applications for financial assistance to support Minor. Although we do not doubt M.J. cares about Minor, we conclude substantial evidence supports the court's determination he was not a presumed father within the meaning of section 7611, subdivision (d).

M.J. argues the trial court erred because it relied on genetic test results confirming he is not Minor's biological father to deny him presumed father status. This is inaccurate both as to the sequence of events and as to the court's reasoning. In fact, the court

ordered genetic testing at the April 14 hearing,[7] but did not receive the results until the June 15 hearing. In the meantime, on May 23, the court heard argument and ruled on M.J.'s request to be considered the presumed father. The court did not have the test results when it denied M.J. presumed father status, but expressly held out the possibility that it might award him discretionary reunification services if the test results later established he was Minor's biological father. (See, e.g., *In re Joshua R.* (2002) 104 Cal.App.4th 1020, 1026 ["The juvenile court has discretion to offer a mere biological father reunification services based on a finding it would benefit the child"], citing § 361.5, subd. (a).)

M.J. is correct that "[p]aternity presumptions are driven not by biological paternity, but by the state's interest in the welfare of the child and the integrity of the family." (*In re T.R., supra*, 132 Cal.App.4th at p. 1209, citing *In re Nicholas H.* (2002) 28 Cal.4th 56, 65.) The fact that genetic testing revealed M.J. is not Minor's biological father, therefore, is not dispositive. "A biological father can be a presumed father, but is not necessarily one; and a presumed father can be a biological father, but is not necessarily one." (*In re T.R.,supra*, at p. 1209, citing *In re Jerry P., supra*, 95 Cal.App.4th p. 801; see also *In re Jesusa V.* (2004) 32 Cal.4th 588, 603–604 [presumed father status is not necessarily rebutted by evidence the individual is not the biological father].) In this case, however, it was well within reason for the trial court to determine that M.J. was not the presumed father irrespective of the genetic testing results.

### III. DISPOSITION

The petition is denied on the merits. (§ 366.26, subd. (*l*)(1)(C); Cal. Rules of Court, rule 8.452(h); *In re Julie S.* (1996) 48 Cal.App.4th 988, 990–991.) The request for a stay of the October 13, 2016 hearing is denied. Our decision is final as to this court immediately. (Cal. Rules of Court, rule 8.490(b)(2)(A).)

---

[7] M.J.'s attorney expressly agreed to the DNA testing, advising the court, "[I]f he's the alleged father and he's in custody, I would think that we would need a DNA test."

_____
Rivera, J.

We concur:

_____
Ruvolo, P.J.

_____
Streeter, J.

14